**UNITED STATES of America,
Plaintiff,**

v.

**Cameron WALKER, Defendant.**

**No. 4:98CR147.**

United States District Court,
N.D. Ohio,
Eastern Division.

Dec. 10, 1998.

Charles E. Fleming, Edward G. Bryan, Office of the Federal Public Defender, Cleveland, OH, for Cameron L Walker, defendant.

Gary D. Arbeznik, Sr., Office of U.S. Atty., Cleveland, OH, for U.S.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Cameron Walker, the defendant, has filed two motions to suppress from the government's case-in-chief any evidence obtained as a result of a warrantless arrest, a line-up identification, and a search pursuant to an allegedly defective warrant. A suppression hearing was held on October 29, 1998, in which this Court received evidence relevant to these motions. Upon consideration, this Court grants Walker's motion to suppress evidence obtained as a result of his unlawful arrest, but denies the part of that motion pertaining to the search of his residence one month later. (Doc. 21). This Court also denies, in its entirety, Walker's motion to suppress evidence resulting from the pre-trial line-up. (Doc. 24).

### I.

Shortly after noon on March 3, 1998, a black male shot and robbed a guard em-

ployed by Dunbar Armored Car Service as the guard was exiting the JC Penney Store located in Randall Park Mall. The perpetrator took the guard's tote bag containing checks and cash from JC Penney, and escaped from the scene in a black, Lexus-type Japanese vehicle. Approximately one hour later, an agent from the Federal Bureau of Investigation (FBI) discovered a black Acura parked in an alley some distance from the Randall Park Mall. The agent saw a Kaufmann's shopping bag and a black tote bag bearing the words "Dunbar Armored" in plain view on the front seat. The Acura was registered to Walker, whose driver's license information revealed that Walker generally matched the physical description of the robber.[1]

Four agents subsequently went to Walker's residence and banged forcefully on the door. Ella Walker, the defendant's mother, was at home taking a bath. She testified at the suppression hearing that it sounded like whomever was at the door was trying to break it down. She hurriedly put on underclothes and a robe, asked who was there, and was told they were law enforcement officers. She opened the door, and the agents demanded entry to the house and information as to her son's whereabouts. The agents stayed at the house for approximately one hour, asking Ms. Walker numerous questions about her recent interactions with Cameron, his use of the Acura, and the robbery itself. She could only report that she had seen her son leave the house early that morning and that he indeed owned a black Acura. Agent James Larkin, who denied in his testimony that they had used coercion to enter the house, stated that the agents subsequently asked for Ms. Walker's consent to search the house to verify that her son was not present. Ms. Walker testified

that forbidding them to conduct the search did not seem to be a realistic option. The agents thoroughly searched the house and confirmed that Cameron Walker was not there. Larkin removed Walker's driver's license from the house for use in their search for him.[2]

Larkin and other agents then went to the home of Camille Daniel, Walker's sister, and stopped Daniel in her car as she was driving away from her home on her way to Bible class. Larkin placed Walker's driver's license on Daniel's dashboard, said that her brother was probably involved in a robbery, and asked to interview her. Daniel agreed to be interviewed, but was unable to provide the agents with any significant information during an hour-long interview.

The testimony regarding the remaining sequence of events on March 3, 1998, is somewhat conflicting. Ms. Walker contacted Charmaine Walker, her other daughter, and Charmaine went to the house. According to Detective Harry Rose of the North Randall Police Department, after Larkin and the other agents had left the Walker residence the first time that day, Rose and one or more agents went back to the house to establish a rapport with Ms. Walker. She maintained her lack of knowledge about Cameron Walker's whereabouts, and Rose assured Ms. Walker that her son would call her "because when a person is in trouble they want to talk to someone that really love [sic] them." Transcript at 169. Ms. Walker recalled this conversation with Rose, but believed that it had occurred during the initial interaction with Larkin and the other agents. Ms. Walker described the day's events as chaotic,[3] and

1. The Acura was impounded and, during an inventory search, $33,569.08 in JC Penney checks and a .380 caliber handgun (matching shell casings found at the crime scene) were found in the vehicle.

2. Ms. Walker was unaware that Larkin had taken the license until her daughter, Camille

Daniel, informed her later that agents had shown it to Daniel outside Daniel's home.

3. The officers who testified at the hearing were also somewhat unclear, and even contradictory, on the sequence of certain events. For example, Detective Rose stated that when he spoke with Ms. Walker, only one of her

stated that she had been very upset by what she perceived to be the officers' mistreatment of her and her home throughout the day. She also testified, as did the officers, that law enforcement personnel had maintained a surveillance of her home from the time of their initial visit until they took her son away that evening.

Agent Johnnie Jacobs, who was conducting the surveillance, saw a young black male approach the Walker residence on foot, and the agent "drove by just in time to see the front door close." Transcript at 198. While Jacobs was radioing other officers, Camille Daniel, who had previously been interviewed at her home, arrived at the house. Daniel and her mother testified that there was then a loud banging on the door, and that when Ms. Walker opened the door, officers pushed their way into the house asserting, "We know he's in here." Transcript at 106, 113–14, 251. Each woman stated that the officers had not obtained consent to enter the house.[4] Larkin, who apparently entered the house first, could not remember how he had made that entry; he stated that "[t]here was some sort of acknowledgment that either I could open the door or the door was opened for me." Transcript at 224–25. Jacobs did not hear the conversation at the door; he only recalled that he was one of at least eight officers who followed Larkin into the house. Rose stated that he had been approaching the house from the street when those officers entered it.

The approximately 10–12 officers who entered the house divided up the four family members for questioning in different areas of the house. Cameron Walker was patted down for weapons or contraband. Walker stated that he had been carjacked that morning, but that he had apparently not reported the incident either because the car was uninsured or because he was overdue on car payments.[5] Ella Walker was very upset and argued with Larkin about the apparent badgering and harassment. She refused to permit the officers to conduct a complete search of the house. Rose escorted the defendant out of the house, patted him down again, and put him in the back seat of a police car. Ella Walker and Camille Daniel testified that an officer had carried out one of Cameron Walker's black jackets and a set of his keys. Detective Rose, however, thought that Walker had worn the jacket during the exit from the house. Daniel believed that Walker was handcuffed as he was escorted out of the house, while Rose stated that he was not in handcuffs. The defendant was driven to the police station, booked (at which time the jacket and keys were inventoried), given *Miranda* warnings, and then interrogated. It was during this interrogation that Rose learned for the first time of Walker's carjacking alibi. An ignition key confiscated during the inventory search was later used in a "pathway examination" with the steering wheel of the Acura.

Meanwhile, after Ella Walker refused to consent to a search of her house, officers told her that if they did not search the premises at that time, then they would proceed to obtain a search warrant and return to execute it at 3:00 a.m. Two officers spoke directly to Camille Daniel, encouraging her to convince her mother that it was better to consent to a search at that time rather than endure a search at 3 o'clock in the morning. Daniel discussed the matter inside the house with her mother while the officers waited outside. Dan-

---

two daughters was present in the home. Agent Johnnie Jacobs testified that both of her daughters were in the house during that interview.

**4.** Cameron Walker did not testify at the hearing, and there is no indication that he personally gave officers consent to enter the house. His two sisters did not live in the home; they were there to check on their mother and brother.

**5.** Larkin could not recall the exact content of his alibi. Ella Walker and her two daughters also told their interviewers that Walker had indicated to them that his car had been stolen.

iel then came outside and indicated to them that Ms. Walker would consent to a search. Ms. Walker signed a consent form, and the officers conducted a search for evidence relating to the robbery. No evidence was found or removed from the house at that time.

The following day, Walker was placed in a line-up with four other black males wearing orange, jail-issued outfits. Walker was the only one in the line-up whose shirt was untucked and who was wearing yellowish, as opposed to brown, jail sandals. Two out of four witnesses, both JC Penney employees, selected Walker as resembling the man they had seen follow the guard out of the store. Walker was subsequently released from custody.

About a month later, on April 1, 1998, FBI Agent Michael Vahue presented an affidavit to Magistrate Judge Jack Streepy in support of a request for a warrant to search Walker's home. The affidavit contained detailed information regarding the robbery, the post-arrest identification of Walker, the test of the ignition key, and other information indicating that there was probable cause to believe that Walker had committed the robbery. The affidavit did not mention, however, that officers had conducted a complete search of the house on March 3, 1998, after Ms. Walker had signed a consent form. Magistrate Streepy issued the search warrant. Officers executed the warrant at the Walker's residence on April 3, 1998, and removed (1) a black leather coat; (2) a key ring containing keys, nailclippers, and car alarm activator; and (3) a form letter regarding Walker's overdue payments on his Acura. Sometime later, federal officers arrested Walker and charged him with obstructing interstate commerce through the use of force and violence (a violation of Title 18, United States Code, Section 1951)

and with using a firearm in relation to that crime of violence (a violation of Title 18, United States Code, Section 924(c)(1)).

Walker has filed motions to suppress evidence obtained as a result of his arrest without a warrant and/or the non-consensual search of his home on March 3, 1988; the line-up conducted on March 4, 1998; and the search of his home pursuant to an allegedly defective warrant on April 3, 1998. The government opposes these motions.

## II.

### A. *Warrantless arrest in home.*

■■■ Prior to assessing the validity of Walker's arrest, it is necessary to establish when the arrest occurred.[6] The Fourth Amendment to the United States Constitution prohibits the seizure of a person in the absence of probable cause. Law enforcement officers may temporarily detain a person when they have a reasonable suspicion that the person is in possession of weapons or otherwise engaged in criminal activity. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A full arrest, however, occurs when an officer restrains a person's movements by a show of authority, such that "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

■■ In the case at bar, officers had probable cause to believe that Walker had committed the armed robbery after they had located Walker's car and established, through their initial conversation with his mother, that he recently had been in possession of the vehicle. Although the government concedes that probable cause existed already at that time, the government

6. This Court is resolving only those legal issues material to the motions to suppress. For example, because Walker does not seek suppression of his driver's license, there is no need to decide whether the FBI agents violated the Fourth Amendment when they entered

and searched the Walker residence for the first time on March 3, 1998. Nonetheless, the entire sequence of events that day is relevant to the legality of Walker's arrest, and this Court considers all relevant facts accordingly.

claims that Walker was not arrested until he actually arrived at the station house. Contrary to the government's assertion, circumstances reveal that the officers intended to arrest Walker when they entered the house again that evening. They had strong reason to believe that Walker was in the house; they had been searching for him and monitoring the house all day; and they had, in fact, previously told Ms. Walker and Camille Daniel that he was probably involved in the robbery. Immediately after entering the house, the family was split up for questioning and the defendant was patted down. In short, the totality of the officers' conduct makes clear their intent to arrest Walker upon entering the house that evening.

Similarly, the government cannot circumvent the requirements of the Fourth Amendment by denying that Walker was arrested when he was escorted out of the home. Daniel testified credibly, and with a stronger recollection than Detective Rose, that her brother was escorted out of the house in handcuffs. Rose himself testified that he patted Walker down again, placed him in the back of a police car, and had him booked as soon as they arrived at the police station. Subsequent to being booked, Walker was given *Miranda* warnings and interrogated.[7] The suggestion that such conduct is not consistent with an arrest is ludicrous, even if Walker was unhandcuffed and calm when he left the house. At least 10–12 officers brought their weight down to bear on the house's occupants. It cannot be gainsaid that a reasonable person would have felt free to leave or, more accurately, free to refuse to leave. As an attorney for the government stated at the hearing, "[w]ithout question, ... he is under arrest at the time he leaves that premises."[8] Transcript at 277.

■■■■ It is well-established "that searches and seizures inside a home without a warrant are presumptively unreasonable."[9] *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). This is so because freedom from intrusion into the sanctity of the home is the "chief evil" against which the Fourth Amendment is directed. *Id.* at 585, 100 S.Ct. 1371. "[T]he Fourth Amendment has drawn a firm line at the entrance to the house," and "that threshold may not reasonably be crossed without a warrant" even when an arrest is made under statutory authority and with clear probable cause. *Id.* at 590, 100 S.Ct. 1371. The Supreme Court considered it an "unequivocal" constitutional command that a warrant is required to arrest someone in his or her home absent consent or exigent circumstances. *Id.* at 576, 602, 100 S.Ct. 1371. It is similarly unequivocal that the Fourth Amendment applies to state as well as federal officers; in sharp contrast to the government's implications in this case, state officers are not exempt from the warrant requirement or other mandates of

7. Walker does not seek suppression of statements he made to law enforcement officers, so the possibility of a *Miranda* violation has neither been argued nor addressed.

8. Despite this acknowledgment, the government also tried to suggest that probable cause did not arise until Walker gave the officers an untenable carjacking alibi during the home interview. This suggestion is meritless, as Rose—the officer who had assumed Walker was "in trouble" and who had physically escorted Walker out of the house—testified that he had heard of this alibi for the first time only when interrogating Walker at the station. And, according to the affidavit Agent Vahue submitted to Magistrate Streepy, Rose had told Vahue that he had arrested Walker on the evening of March 3, 1998 based on his physical resemblance to descriptions of the robber.

9. Because Walker proffered evidence to show that he had been arrested in his home without a warrant, the arrest was "presumptively unreasonable" under *Payton* and, accordingly, the government carries the burden of rebutting this presumption. Moreover, the government argues that the officers had consent to enter the home, and the government always carries the burden of proving that consent was voluntary. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

the Fourth Amendment.[10] *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (exclusionary rule applies to state violations of Fourth Amendment); *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (Fourth Amendment made applicable to the states by the Fourteenth Amendment).

■ The parties do not dispute that there were no exigent circumstances to justify the warrantless arrest of Walker. The government instead argues that the Walkers consented to the officers' entry into the home. Consent is a question of fact to be determined under the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The government must prove consent "by clear and positive testimony, and, to be voluntary [consent] must be unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." *United States v. Scott,* 578 F.2d 1186, 1188–89 (6th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978). To decide whether a person's "will was overborne" by law enforcement officers, *Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041, it is appropriate to consider various factors such as knowledge of the right to refuse consent; the use or threat of force; the use of threatening language; the length of detention; the in-

dividual's age and mental capacity; and other "more subtle forms of coercion that might flaw [one's] judgement." *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *see also United States v. Erwin,* 155 F.3d 818, 823 (6th Cir.1998) (en banc); *United States v. Blakeney,* 942 F.2d 1001, 1016 (6th Cir.), *cert. denied,* 502 U.S. 1008, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991).

■ The totality of circumstances in this case reveals that the officers did not have consent to enter the Walker residence when they arrested the defendant on March 3, 1998. Prior to the arrest entry, federal agents had upset Ella Walker by threatening force to gain entry into the home and by searching the whole house for her son. Both federal and state officers then set up a surveillance of her house and conducted yet another interview of Ms. Walker in her home. She testified very credibly that she felt harassed and badgered.[11] Both she and her daughter credibly asserted that when Ms. Walker opened the door to Larkin and the other officers, they pushed their way inside the house declaring, "We know he's in here." In contrast, the officers who testified at the hearing either could not remember the nature of the entry or were too far from the door to know what had occurred.[12]

10. In a befuddling argument, the government attempts to make a distinction between federal agents' proclivities for obtaining a warrant (where "more than probable cause" is considered desirable) and the obligations of state officers. Any such distinction is irrelevant here; both state and federal officers were prohibited from making a warrantless, nonconsensual entry into the house unless exigent circumstances existed. The government's assertion that "a state law enforcement agent is not required to get a warrant to make an arrest" is disingenuous at best; *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), the case cited by the government, deals specifically with arrests in *public* places, is thoroughly distinguished in *Payton,* and involves the statutory authority of federal postal inspectors to make warrantless arrests.

11. The government's attempts to describe Ms. Walker's memory as faulty are unavailing. In light of the stress, chaos, and sustained questioning she endured, any inaccuracy on her part regarding the timing of her conversation with Detective Rose is both understandable and inconsequential.

12. Agent Larkin stated that there had been some sort of acknowledgment that either he could open the door or the door had been opened for him. It stretches plausibility beyond all recognition to think that Ms. Walker, feeling harassed and in the midst of discussing the day's events with her son, would say, "Come on in!" to the battalion of officers at her door. The totality of circumstances does not support a finding that Ms. Walker was in a mindset to consent to the entry of her home.

■ Even assuming that the officers walked into the house without "pushing," there is no evidence that they asked to enter or otherwise obtained Ms. Walker's valid consent to do so. No one disputes that the occupants were never told that they had the right to refuse the officers' entry. Opening the door alone is not equivalent to granting permission for entry. *See New York v. Harris*, 495 U.S. 14, 15–17, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (Fourth Amendment violated when police knocked on door, displayed guns and badges, and entered house with defendant's permission). Moreover, the conduct of the officers once they were inside the house indicates that their presence in the house was not welcome or consensual. At least 10–12 officers divided the family up for prolonged questioning; an argument ensued between Ms. Walker and one of the agents; and Ms. Walker "said she wanted [the officers] out of her house." Transcript at 200. She signed the consent-to-search form grudgingly, after the officers promised to obtain a search warrant and return to execute it at 3:00 a.m. In light of all these facts, this Court finds that the officers did not have consent to enter the Walker home on the occasion of the defendant's arrest. Even if the officers believed they had obtained consent, such "consent" could not be described as voluntary, but only as "the result of duress or coercion." *Schneckloth*, 412 U.S. at 248, 93 S.Ct. 2041. This conclusion is particularly compelled by the fact that the officers had ample time and opportunity to seek an arrest warrant.[13]

■ It is necessary, therefore, to exclude the evidence obtained during Walk-er's unlawful arrest: a black jacket and a set of keys (including the key used in the ignition test). *Mapp v. Ohio*, 367 U.S. at 655, 81 S.Ct. 1684. The defendant claims that an officer grabbed these two items, and, therefore, that their seizure can be seen as resulting from both the warrantless arrest and a nonconsensual search of the home at the time of his arrest. Whether the items were in plain view or located pursuant to a brief search, this Court finds that the jacket and keys were seized from Walker incident to his arrest in the home. That is, the items constitute "evidence found … inside the home" as a result of a *Payton* violation. *New York v. Harris*, 495 U.S. 14, 20, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990).

■ In its opposition memorandum, the government fleetingly notes, without discussion, that the keys and jacket would have inevitably been found during the search of the Walker home conducted later that night. Although the government failed to meet its burden to prove the applicability of the inevitable discovery doctrine, *see Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (government carries burden), this Court notes that the inevitable discovery doctrine would not preclude use of the exclusionary rule in this case. There were not two simultaneous, independent investigations occurring at the time of Walker's arrest; nor were there any "compelling facts" outside the unlawful search itself to establish that the jacket and keys would have inevitably been discovered. *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir.1995), *cert. denied*, 517 U.S. 1119, 116

---

**13.** The words of Justice Jackson, quoted with strong approval in *Payton*, bear repeating here: "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement officers the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enter-prise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue [an arrest] warrant will justify the officers in making [an arrest] without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers." *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (footnotes omitted).

S.Ct. 1351, 134 L.Ed.2d 520 (1996); *see also Nix,* 467 U.S. at 449–50, 104 S.Ct. 2501; *United States v. Boatwright,* 822 F.2d 862, 865 (9th Cir.1987). Walker was in complete possession of these items prior to the unlawful arrest, and guessing what might have happened if the officers had acted constitutionally solely involves conjecture. Expanding the scope of the inevitable discovery doctrine to cover situations like this one would reduce the Fourth Amendment to a nullity and eviscerate the deterrent value of the exclusionary rule.

This Court finds that the arrest of Walker on March 3, 1998, violated the Fourth Amendment and that the items obtained pursuant to that arrest—a jacket and set of keys—must be suppressed as evidence in this case.[14]

B. *Search pursuant to allegedly defective warrant.*

 Walker also argues that FBI Agent Michael Vahue recklessly disregarded the truth in the affidavit he submitted to Magistrate Streepy. Under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a warrant is defective if based on intentionally or recklessly false statements that are material to the probable cause finding. The *Franks* doctrine also applies to the omission of material information from an affidavit. *See United States v. Bonds,* 12 F.3d 540, 568–69 (6th Cir.1993). However, *Franks* only applies to the omission of facts "where ... the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause." *Mays v. City of Dayton,* 134 F.3d 809, 816 (6th Cir.), *reh'g denied, cert. denied,* —— U.S. ——, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998) (emphasis in original).

██ Walker contends that Agent Vahue failed to inform Magistrate Streepy that (1) a thorough search of the residence had been conducted on the day of the robbery;[15] (2) a leather jacket had already been seized at the time of his arrest; and (3) none of the other items listed in the search warrant had been found during the previous searches. While this Court is troubled by Vahue's omission of these important facts, Walker has not demonstrated that Vahue intended to mislead Magistrate Streepy. Vahue was not present at the home on March 3, 1998; he did not testify at the suppression hearing; and the face of the affidavit alone does not show that Vahue possessed the requisite intent for a violation of *Franks* and *Mays.* Even if this Court inferred that Vahue intended to mislead the magistrate, it is not clear that the omissions were "critical" to, or negated, the probable cause finding. *Mays,* 134 F.3d at 816. That is, if one includes the three pieces of omitted material listed above in the affidavit, there likely was still probable cause to issue a search warrant. The affidavit already explained that Walker had been arrested at his home on March 3, 1998, and that keys had been confiscated incident to that arrest. Had Vahue mentioned that Walker had been released from custody within a few days of his initial arrest—another piece of information omitted from the affidavit—it would not have been unreasonable for Magistrate Streepy to find that other incriminating evidence could still probably be found in the residence (i.e., a red baseball cap, additional Dunbar bags, a different black jacket, a portion of the checks and cash that had not been found). Although omitting information regarding the prior search(es) appears deceptive, it

---

14. As discussed below, the line-up identification of Walker on March 4, 1998, cannot properly be considered tainted fruit of the unlawful arrest under the reasoning of *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990).

15. Walker contends that in addition to the search conducted after his mother had signed the consent form, officers had conducted two other searches of the home that day: a search for his person the first time they were there, and a brief search of the house at the time of his arrest.

has not been shown, in accordance with the high hurdle set by *Franks* and *Mays*, that Vahue intended to mislead Magistrate Streepy and that inclusion of this information would have negated the finding of probable cause.

### C. *Line-up identifications.*

 As this Court indicated at the suppression hearing, the line-up procedures in this case did not offend due process. *See* Transcript at 271–73. The fact that Walker was the only person with an untucked shirt and yellowish jail sandals, while somewhat suggestive in light of the shuffling of the inmates prior to the second identification, cannot be described as impermissibly suggestive. *See Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 198–99, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). One of the other suspects was the only individual wearing a white tee-shirt under his prison uniform, and that fact is arguably more suggestive than Walker's untucked shirt and differently-colored sandals.

 Even assuming that Walker's sandals and untucked shirt were unnecessarily suggestive, these procedures did not result in unreliable identifications under the "totality of the circumstances." *Biggers,* 409 U.S. at 199, 93 S.Ct. 375; *see also United States v. Hill,* 967 F.2d 226, 232 (6th Cir.), *cert. denied,* 506 U.S. 964, 113 S.Ct. 438, 121 L.Ed.2d 357 (1992) (once defendant proves impermissibly suggestive identification procedure, court will determine overall reliability of identification). To determine whether procedures are substantially likely to result in a misidentification, courts consider the five factors delineated in *Biggers:* (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4)

the level of certainty demonstrated by the witness at the identification; and (5) the length of time between the crime and the identification.

 Under the first of these factors, it appears that the two witnesses who identified Walker had an ample opportunity to view him in the store. Second, their degree of attention was high, as they were trained to keep an eye on customers, especially customers who seemed to be loitering. Although there is no specific information regarding the witnesses' pre-identification descriptions of Walker, there is evidence that after the robbery, witnesses gave a description of the perpetrator that generally matched the appearance of Walker. The fourth *Biggers* factor is the one most favorable to Walker, as the witnesses were not entirely certain that Walker was the robber at the time of the identification. Finally, the fifth *Biggers* factor supports the government's position; only one day had elapsed between the time of the robbery and the time of the line-up. In consideration of all these factors, it cannot be said that the identifications were so unreliable as to involve a "substantial likelihood of misidentification." [16] *Biggers,* 409 U.S. at 201, 93 S.Ct. 375. The witnesses' uncertainty at the time of the identification will be a matter to which the jury must assign "ultimate weight." *Smith v. Perini,* 723 F.2d 478, 482 (6th Cir.1983), *cert. denied,* 466 U.S. 941, 104 S.Ct. 1920, 80 L.Ed.2d 466 (1984). In sum, the line-up identifications are sufficiently reliable to comport with due process and be permitted into evidence.

 Lastly, Walker argues that the line-up identifications were the "tainted fruit" of his unlawful arrest on the previous evening. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (evidence directly obtained from exploitation of illegally-ob-

---

**16.** This Court also takes notice of, and is influenced by, the fact that the identifications were not cross-racial; Walker and both witnesses who identified him are African–American.

tained evidence is excludable). However, *New York v. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), holds that only "evidence found, or statements taken, inside the home" are excludable as a result of a *Payton* violation. *Id.* at 20, 110 S.Ct. 1640. According to the Supreme Court, this is so because *Payton* violations occur when law enforcement officers have probable cause to arrest a suspect, and thus excluding statements or evidence obtained outside the home would have little deterrent effect on officers. *Id.* at 20–21, 110 S.Ct. 1640. Because the line-up identifications were not dependent upon Walker's arrest in his home "rather than someplace else," *Harris*, 495 U.S. at 19, 110 S.Ct. 1640, *Harris* compels a finding that the line-up identifications of Walker are not excludable as fruit of his unlawful arrest.

### III.

For the foregoing reasons, this Court concludes that Walker's motion to suppress evidence obtained during his unlawful arrest on March 3, 1998, must be suppressed. Accordingly, the government is ordered not to use or refer to the black jacket and set of keys obtained on that occasion. This Court denies, however, Walker's motions to suppress the line-up identifications on March 4, 1998, and the search pursuant to a warrant on April 3, 1998.

IT IS SO ORDERED.