[Cite as *State v. Hudson*, 2022-Ohio-3253.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29333 |
| | : | |
| v. | : | Trial Court Case No. 2020-CRB-2125 |
| | : | |
| JAYLEN BRAXTON HUDSON | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of September, 2022.

. . . . . . . . . . .

STEPHANIE L. COOK, Atty. Reg. No. 0067101 & ANDREW D. SEXTON, Atty. Reg. No. 0070892, Assistant Prosecuting Attorneys, City of Dayton County Prosecutor's Office, Appellate Division, 335 West Third Street, Room 372, Dayton, Ohio 45402
        Attorneys for Plaintiff-Appellee

BRYAN K. PENICK, Atty. Reg. No. 0071489 & JOANNA W. GISEL, Atty. Reg. No. 0100701, 40 North Main Street, 1900 Stratacache Tower, Dayton, Ohio 45423
        Attorneys for Defendant-Appellant

. . . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Jaylen Braxton Hudson appeals his conviction in the Dayton Municipal Court following his no contest plea to one count of voyeurism; other charges were dismissed in exchange for his plea. In support of his appeal, Hudson argues that the trial court erred by overruling his motion to sever the offenses for trial. He further argues that the trial court erred in overruling the motion to suppress his statements as well as the contents of his cell phone. For the reasons outlined below, we affirm the judgment of the trial court.

## I. *Facts and Procedural History*

{¶ 2} On July 8, 2020, Hudson was charged by way of complaint with two counts of voyeurism, each in violation of R.C. 2907.08(B), misdemeanors of the second degree, and two counts of nonconsensual dissemination of private sexual images, each in violation of R.C. 2917.211, misdemeanors of the second degree. The charges stemmed from allegations that Hudson secretly video recorded a woman in her bathroom in a state of nudity on two occasions and then uploaded the videos to a pornographic website on the internet without her knowledge or permission.

{¶ 3} On September 10, 2020, Hudson filed a motion to suppress, challenging statements Hudson made to Detective Harry Sweigart and the seizure and subsequent search of his cell phone. A hearing on the motion to suppress was held on January 14, 2021, with Detective Sweigart as the State's sole witness.

{¶ 4} Detective Sweigart testified that he had been a detective with the University of Dayton since 1995 and had been in law enforcement since 1978. Sweigart explained

that on November 6, 2019, S.D.[1] contacted the University of Dayton police department stating that two videos of her were clandestinely taken during the 2017/2018 school year, while she was a student and lived in the University of Dayton housing community. The videos depicted her nude in her bathroom preparing to take a shower or immediately after getting out of the shower on two separate occasions. According to the search warrant that was introduced during the hearing, one video titled "Hot College Girl Dries off after Shower" was uploaded to Pornhub, a legally operated public pornographic website, on February 19, 2019. A second video titled "Hot UD college girl prepares for shower" was uploaded to Pornhub on August 24, 2019. According to S.D., she neither consented to the videos being taken nor to their being uploaded onto Pornhub. S.D. suspected that Hudson was involved, because he was her roommate's boyfriend at the time the videos were taken.

{¶ 5} As a result of the allegations, Sweigart subpoenaed Pornhub's records, which showed that the videos were uploaded by a person with the username Bluejay91 and an email of JaylenHudson23@yahoo.com. The IP address from which at least one of the videos was posted was located in Columbus, Ohio.

{¶ 6} In his attempts to locate Hudson, on December 12, 2019, Sweigart and a uniformed University of Dayton police officer, Officer John Key, went to Hudson's residence in Columbus, but he was not home. Sweigart spoke to Derrick Hudson, Hudson's uncle, and Beverly Hudson, Hudson's mother, both via telephone in his attempts to locate Hudson. They informed him that Hudson had been sick and in the

---

[1] S.D. was the individual recorded and we will identify her only by her initials to protect her identity.

hospital recently and Hudson's mother provided Sweigart with Hudson's phone number. That same day, Sweigart got in touch with Hudson via telephone and arranged to meet with him at Wright State University (WSU), where Hudson was attending as a graduate student. Hudson was involved in a project that morning at the university and agreed to meet with Sweigart when he was finished, around 12:30 p.m.; Hudson informed Sweigart of the name of the building in which to meet. As a result, Sweigart and Officer Key went to WSU to interview Hudson. Because they were at another university and Hudson's uncle had contacted the school, a WSU police officer accompanied the University of Dayton officers to the building where Hudson had told Sweigart to meet him. While waiting for Hudson to arrive, the WSU officer and Officer Key left to get coffee while Sweigart waited for Hudson to arrive.

{¶ 7} Around 12:30 p.m., Sweigart observed Hudson coming up the steps to the second floor lounge area where Sweigart was waiting. After Sweigart introduced himself and informed Hudson of the purpose of the interview, Hudson agreed to speak with Sweigart. Behind the lounge area was a large unoccupied conference room which they agreed to use for the interview. The conference room had double glass doors that were unlocked and ceiling-height windows on two walls overlooking an outside parking lot. Although one door was initially open when Sweigart and Hudson entered, Hudson asked to close the door, which he did.

{¶ 8} Once they were both seated, Sweigart informed Hudson that he was not going to arrest him and just wanted to talk. Hudson was not in handcuffs and, besides shaking hands, there was no physical contact during their entire interaction. Only

Sweigart and Hudson were present in the conference room, and Hudson was not blocked from exiting the doorway. Although Sweigart had a service weapon on his person, it was on his hip covered by a jacket and Sweigart never touched it, brandished it, or discussed having it.

{¶ 9} After explaining to Hudson the details of the case, Sweigart read Hudson his *Miranda* warnings verbatim from a printed pre-interview form. Hudson filled out the top portion of the form identifying his name and address, the date, time, and location, and then initialed next to each *Miranda* warning after Sweigart read it out loud. At the end of the rights, Hudson signed his name indicating that the rights had been read to him and that he understood them. The bottom of the form included a waiver section that Hudson was asked to read to himself. Where there was a blank to indicate the amount of years of schooling he had, Hudson wrote his name and then signed the form with two lines.

{¶ 10} During the course of the interview, Hudson admitted that he had purchased a phone charger that had a video camera built into it that captured the two videos in question. He admitted that he had posted the videos on Pornhub but denied posting them anywhere else. Hudson advised that he did not have the camera anymore but that the videos were on his cell phone, which was sitting on the table in front of him during the interview.

{¶ 11} After learning that the videos were on Hudson's cell phone, Sweigart informed Hudson that he would need to take the phone to remove the videos and make sure there was nothing else on there. He explained that "the best way to do it" is to sign a consent to search form so he could take the phone with him and have it analyzed.

Hudson asked if he could show Sweigart the videos right then to delete them, but Sweigart declined, explaining that the phone was evidence and he would have to take it to a lab guy. Sweigart stated that he could not have anything deleted knowing that there was evidence on the phone. Thereafter, Sweigart completed a consent to search form for the phone and Hudson signed it. When asked, Hudson provided his passcode to his phone and Sweigart placed Hudson's phone on airplane mode to prevent anything from being erased.

{¶ 12} At the conclusion of the approximately one hour interview, Sweigart left with Hudson's cell phone; Hudson was not arrested. The following morning, Sweigart obtained a search warrant for Hudson's phone, which was granted. After the search warrant was signed, he took a copy of it along with Hudson's phone to another officer to perform the search of the phone.

{¶ 13} Beverly Hudson testified on behalf of Hudson at the motion to suppress hearing. Beverly stated that Detective Sweigart had called her on December 12, 2019, looking for her son. She informed him that Hudson was not available and unable to talk because he had just been released from the hospital after an almost two-week long stay. She noted that she told Sweigart that Hudson had lost 50 pounds and was on strong medication. Although Beverly lived in Atlanta, Georgia, she had come up to the hospital to be with Hudson and testified that he had been released from the hospital the day before the interview. She stated that Hudson was 24 years old, had graduated from the University of Dayton, and was getting a post-graduate Master's degree at WSU. She was aware that Hudson had had a dissertation to present on December 12, 2019, but,

according to her, he was still ill.

{¶ 14} Prior to the motion to suppress hearing, Hudson filed a motion to dismiss one count of nonconsensual dissemination of private sexual images that was alleged to have occurred on February 19, 2019, which was prior to the effective date of the statute, March 22, 2019. At the hearing, the State did not object to the dismissal, and this count was eventually dismissed. After the suppression hearing, Hudson filed a motion to sever the remaining charges for trial.

{¶ 15} On October 12, 2021, the trial court overruled Hudson's motion to suppress in its entirety. Thereafter, the trial court denied Hudson's motion to sever in its entirety. On December 2, 2021, Hudson entered a no contest plea to one count of voyeurism, and the remaining counts were dismissed. Hudson was found guilty by the court and sentenced to 90 days in jail, with all 90 days suspended, six months of probation, no contact with the victim, a $200 fine with $100 suspended, and court costs. Hudson was also ordered to register as a Tier I sex offender with registration annually for a period of 15 years.

{¶ 16} Hudson filed a timely appeal and was granted a motion to stay his sentence pending appeal.

## II. *Motion to Sever Charges*

{¶ 17} Hudson's first assignment of error claims that the trial court erred in failing to sever his charges for trial. Hudson asserts that the alleged offenses occurred on different dates that were too far apart in time to be considered part of a common scheme or plan or as part of a course of criminal conduct. He further argues that joinder would

-8-

have prejudiced him.   We disagree.

{¶ 18} Pursuant to Crim.R. 13, a trial court may order two or more complaints to be tried together if the offenses could have been joined in a single complaint.   Crim.R. 8(A) provides, in relevant part, that two or more offenses may be charged in the same complaint in a separate count for each offense if they "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."   The law favors joinder because it "conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that can occur in successive trials before different juries."   *State v. Hamblin*, 37 Ohio St.3d 153, 158, 524 N.E.2d 476 (1988).

{¶ 19} Nevertheless, "[e]ven if offenses are properly joined pursuant to Crim.R. 8(A), a defendant may move to sever the charges pursuant to Crim.R. 14."   *State v. Snowden*, 2019-Ohio-3006, 140 N.E.3d 1112, ¶ 48 (2d Dist.).   "It is the defendant's burden to demonstrate that joinder is prejudicial[.]"   *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, ¶ 21.   A defendant who claims error in the denial of severance "must affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial."   *State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992), citing *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981),

syllabus. "But even if the equities appear to support severance, the state can overcome a defendant's claim of prejudicial joinder by showing either that (1) it could have introduced evidence of the joined offenses as 'other acts' under Evid.R. 404(B) or (2) the 'evidence of each crime joined at trial is simple and direct.' " *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 44, quoting *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990). The two tests are disjunctive such that if either the "other acts" test or the "simple and direct" test is met, a defendant cannot establish prejudice from the joinder. *State v. Mills*, 62 Ohio St.3d 357, 362, 587 N.E.2d 972 (1992).

{¶ 20} Evid.R. 404(B) recognizes that evidence of other crimes, wrongs, or acts may be admissible for purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." If one offense could be introduced under Evid.R. 404(B) at the trial of the other offenses had the offenses been tried separately, "any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Schaim* at 59, quoting *Drew v. United States*, 331 F.2d 85, 90 (D.C.Cir.1964).

{¶ 21} "Under the second method, the 'joinder' test, the state is merely required to show that evidence of each crime joined at trial is simple and direct." *Lott* at 163, citing *State v. Roberts*, 62 Ohio St.2d 170, 405 N.E.2d 247 (1980). "Evidence is simple and direct if the jury can readily separate the proof required for each offense, the evidence is straightforward and unlikely to confuse jurors, and if there is little danger that the jury would improperly consider testimony on one offense as corroborative of the other."

(Citations omitted.) *State v. Pate*, 2021-Ohio-1838, 173 N.E.3d 567, ¶ 57 (2d Dist.).

{¶ 22} "An appellate court will reverse a trial court's decision to deny severance only if the trial court has abused its discretion." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 49, citing *Lott* at 163. A trial court abuses its discretion when it acts in an unreasonable, arbitrary, or unconscionable manner. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 23} The facts in this case indicate that joinder was proper. The offenses were of the same or similar character, were based on two or more acts or transactions connected together, and were part of a course of criminal conduct. Notably, the basis for the charge in Count One, a recording secretly taken of the victim in her bathroom, was the basis of the charge for Count Three when the same video was uploaded to Pornhub. Thus, the recorded video formed the background of the disseminating charge such that the two charges were inextricably intertwined and formed a course of criminal conduct. *See e.g. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, at ¶ 19 (although separate offenses were committed at different times, defendant's attempt to intimidate a witness from testifying on a robbery charge connected the two charges together and formed a course of criminal conduct pursuant to Crim.R. 8(A)). Likewise, both the voyeurism charges were of the same or similar character as they were based on substantially similar videos of the same victim at the same location and obtained in the same covert manner, but taken on two different days. The fact that there was a year or two gap in time between recording of the videos and uploading the videos did not break the connection of the offenses. *See State v. Schiebel*, 55 Ohio St.3d 71, 72, 564 N.E.2d

54 (1990) (despite the temporal separation between offenses, the evidence for each of the offenses was inextricably intertwined and properly joined for trial).

{¶ 24} Further, Hudson would not have been prejudiced by the joinder because the evidence of the three crimes was both simple and direct. "[W]hen simple and direct evidence [of each crime joined at trial] exists, an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as 'other acts' under Evid.R. 404(B)." *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293. Each of the crimes in this case involved the same victim and witnesses as well as significantly the same evidence. As the Supreme Court of Ohio has recognized, when a witness is a material witness in two separate cases there is no prejudice in trying the cases together. *Gordon* at ¶ 28. "A material witness is '[a] witness who can testify about matters having some logical connection with the consequential facts, esp. if few others, if any, know about those matters.' " *Id.*, quoting *Black's Law Dictionary* 1839 (10th Ed.2014). Here, the victim was a material witness for each of the three offenses who would testify as to her identity as the individual depicted in the videos, the location and the timing of the creation of the videos, and that she did not give consent to Hudson to either take the videos or to publish them. She was also the individual who learned of the videos on Pornhub and initiated the investigation into all of the charges. Likewise, Detective Sweigart was a material witness who would testify on each charge to explain his investigation, which would include identifying Hudson as the perpetrator, Hudson's admissions to all of the offenses made during his interview, and the introduction of physical evidence.

{¶ 25} The evidence in this case also makes it highly unlikely that the jury would

confuse the three offenses and be unable to segregate the proof required for each offense, or that it would improperly consider the testimony on one offense as corroborative of the other. The two individual video recordings constituted the two distinct voyeurism charges, while the uploading of one video on a particular date constituted the disseminating charge.

{¶ 26} Furthermore, even if the offenses in question had been severed, the evidence from one case would have otherwise been admissible in the other cases as other-acts evidence under Evid.R. 404(B). Although not explained in the trial court, at oral argument Hudson alleged that his defense would have been that he had committed the offenses accidentally. Evid.R. 404(B) explicitly provides that evidence of other acts is admissible to prove lack of accident or mistake.

{¶ 27} Because there would have been no prejudice to Hudson in jointly trying the offenses in question, the trial court did not err in overruling his motion to sever. His first assignment of error is overruled.

### III. *Motion to Suppress Statements*

{¶ 28} In his second assignment of error, Hudson challenges the trial court's decision overruling his motion to suppress the statements he made to Detective Sweigart during his interview. Hudson claims that his statements should have been suppressed because: (1) they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) his *Miranda* waiver was not made knowingly, intelligently, and voluntarily; (3) even if *Miranda* did not apply, his statements were made involuntarily; and (4) Detective Sweigart ignored Hudson's attempt to invoke his right to

counsel.   We find no merit to any of these arguments.

### a. Standard of Review

{¶ 29} "In ruling on a motion to suppress, the trial court 'assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses.' "   *State v. Prater*, 2012-Ohio-5105, 984 N.E.2d 36, ¶ 7 (2d Dist.), quoting *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994).   "As a result, when we review suppression decisions, 'we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard.' "   *Prater* at ¶ 7, quoting *Retherford* at 592.

### b. Custodial Interrogation

{¶ 30} In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court outlined procedural safeguards needed for securing the privilege against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution.   "*Miranda* requires police to give a suspect certain prescribed warnings before custodial interrogation commences and provides that if the warnings are not given, any statements elicited from the suspect through police interrogation in that circumstance must be suppressed."   *State v. Petitjean*, 140 Ohio App.3d 517, 523, 748 N.E.2d 133 (2d Dist.2000).   "If a suspect provides responses while in custody without having first been informed of his or her *Miranda* rights, the responses may not be admitted at trial as evidence of guilt."   *Cleveland v. Oles*, 152 Ohio St. 3d 1, 2017-Ohio-5834, 92

N.E.3d 810, ¶ 9, citing *Miranda* at 479. Furthermore, if, after *Miranda* warnings are given, the suspect indicates that he or she wishes to remain silent, or if the suspect states that he or she wants an attorney, the interrogation must cease. *Maryland v. Shatzer*, 559 U.S. 98, 104, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010).

{¶ 31} Police, however, are not required to administer *Miranda* warnings to every person they question, even if the person being questioned is a suspect. *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997), citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Rather, *Miranda* warnings are required only for custodial interrogations such that, "[u]ntil suspects are 'in custody,' they do not have a right to warnings under *Miranda*[.]" *State v. Moody*, 2012-Ohio-3390, 974 N.E.2d 1273, ¶ 12 (2d Dist.). "The mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings[.]" *Minnesota v. Murphy*, 465 U.S. 420, 431, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

{¶ 32} "An individual is in custody when there has been a formal arrest or a restraint of freedom of movement such that a reasonable man would believe that he is under arrest." *State v. Wenzler*, 2d Dist. Greene No. 2003-CA-16, 2004-Ohio-1811, ¶ 15, citing *Biros* at 440. "A seizure is equivalent to an arrest when (1) there is an intent to arrest; (2) the seizure is made under real or pretended authority; (3) it is accompanied by an actual or constructive seizure or detention; and (4) it is so understood by the person arrested." *State v. Taylor*, 106 Ohio App.3d 741, 749, 667 N.E.2d 60 (2d Dist.), citing *State v. Barker*, 53 Ohio St.2d 135, 372 N.E.2d 1324 (1978), syllabus.

{¶ 33} "The subjective views of the interviewing officer and the suspect are

immaterial to the determination of whether a custodial interrogation was conducted." (Citations omitted.) *In re L.G.*, 2017-Ohio-2781, 82 N.E.3d 52, ¶ 13 (2d Dist.). "The inquiry whether a person is subject to custodial interrogation is an objective question, focusing on how a reasonable person in the suspect's position would have understood the situation." (Citations omitted.) *Id.* While not exhaustive, this Court has considered the following factors in applying this reasonable person test:

1) What was the location where the questioning took place-i.e., was the defendant comfortable and in a place a person would normally feel free to leave? * * *;

2) Was the defendant a suspect at the time the interview began * * *;

3) Was the defendant's freedom to leave restricted in any way;

4) Was the defendant handcuffed or told he was under arrest;

5) Were threats * * * made during the interrogation;

6) Was the defendant physically intimidated during the interrogation;

7) Did the police verbally dominate the interrogation;

8) What was the defendant's purpose for being at the place where questioning took place? * * *;

9) Were neutral parties present at any point during the questioning;

10) Did police take any action to overpower, trick, or coerce the defendant into making a statement.

*State v. Estepp*, 2d Dist. Montgomery No. 16279, 1997 WL 736501, *4 (Nov. 26, 1997).

{¶ 34} The trial court found that Hudson's interview did not amount to a custodial

interrogation requiring that Hudson be *Mirandized*. We agree.

{¶ 35} Detective Sweigart and Hudson mutually set up a time and location to meet at WSU, where Hudson was attending graduate school. Hudson voluntarily agreed to meet with Sweigart after he was finished with a school event and informed Sweigart in which building to meet him. Upon seeing Hudson walking up the stairs to where Sweigart was waiting, Sweigart introduced himself and asked Hudson if he would be willing to talk. They mutually agreed to talk in the unoccupied large conference room that had floor to ceiling windows on two of the walls. The glass doors to the conference room, while closed by Hudson himself, were not locked, and there was nothing physically preventing Hudson from being able to walk out of the room if he had wished to leave. Hudson never asked to leave and was not prevented from leaving at any time. Hudson was never handcuffed or physically restrained. For the majority of the interview, no one else was present in the conference room besides Sweigart and Hudson. When the uniformed officers briefly appeared at the doorway, they did not participate in the interview in any way and promptly left after the detective provided his car keys for Officer Key to wait in the car.

{¶ 36} Sweigart testified that he did not expressly inform Hudson that he was free to leave, however, he explicitly told Hudson that he was not being arrested that day and testified that he had no intention of arresting Hudson that day. Notably, at the end of the approximately one-hour interview, Hudson was not arrested.

{¶ 37} While we agree with the trial court that the detective verbally dominated the interview, we do not find this factor sufficient to transform the interview into a custodial

interrogation.  The United State Supreme Court has explained:

> [A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment."  Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.  But police officers are not required to administer *Miranda* warnings to everyone whom they question.  Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."  It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

{¶ 38} Considering the totality of the circumstances, a reasonable person in Hudson's position would have understood that his movement was not restrained to the degree associated with a formal arrest and that he would have been free to leave. Therefore, he was not in custody for purposes of *Miranda*.  Because it was unnecessary to inform Hudson of the *Miranda* warnings, we need not consider whether Hudson knowingly, intelligently, and voluntarily waived his *Miranda* rights.

## IV. Voluntary Statements

{¶ 39} Although *Miranda* warnings were not required, our inquiry into the voluntariness of Hudson's confession does not end. "Even when *Miranda* warnings are not required, a confession may be involuntary and subject to exclusion if, under the totality of the circumstances, the defendant's will was overborne by the circumstances surrounding the giving of his confession." *State v. Kelly*, 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305, ¶ 11, citing *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *overruled on other grounds*, *Edwards v. Ohio*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978). However, "[c]oercive police activity is a necessary predicate to finding that a confession is not voluntary." *State v. Knight*, 2d Dist. Clark No. 2004-CA-35, 2008-Ohio-4926, ¶ 113. "In *Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473, the court held that 'police over-reaching' is a prerequisite to a finding of involuntariness. Evidence of use by the interrogators of an inherently coercive tactic (e.g., physical abuse, threats, deprivation of food, medical treatment, or sleep) will trigger the totality of the circumstances analysis." *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988). "Accordingly, we need not assess the totality of the circumstances unless we find that the tactics used by the

detectives were coercive." *State v. Treesh*, 90 Ohio St. 3d 460, 472, 739 N.E.2d 749 (2001), citing *Clark* at 261. "The voluntariness of a confession is a question of law that an appellate court reviews de novo." (Citations omitted.) *Kelly* at ¶ 11.

**{¶ 40}** In the present case, Hudson contends that his statements were involuntary due to Sweigart's repeated threats of jail during the interview, which Hudson characterizes as one in which "deception and coercion were rampant." Brief of Appellant, p. 16. We disagree with Hudson's characterization of the interview and do not find that Hudson's will was overborne by coercive police conduct.

**{¶ 41}** Although references to jail were made by Sweigart during the interview, it was most commonly in the context of how Sweigart did *not* want to arrest Hudson. At the beginning of the interview, Sweigart unambiguously informed Hudson he was not going to arrest him. Sweigart explained that he did not want to arrest people and then have the prosecutors try to figure things out later. Rather, he wanted to get the full story and figure everything out ahead of time. While Hudson was filling out the pre-interview form, he asked what was going to happen. Sweigart explained that he was going to investigate the case further and then, if Hudson had committed the offenses, Sweigart would file charges and Hudson would appear in court. Again, Sweigart told Hudson, "I don't plan on putting you in cuffs or anything stupid like that. I'm just trying to get the facts and everything." Suppression Hearing Transcript ("Hrg. Tr."), p. 19. When Hudson asked if he would go to jail in connection to the filing of the charges, Sweigart explained that it was possible he could go to jail, but that was up to the prosecutor. "[I]t is not unduly coercive for a law-enforcement officer to mention potential punishments."

*State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 198. In this case, Sweigart merely informed Hudson of the potential for what could occur in the case in the future; he neither misstated the law nor the potential penalties that Hudson faced.

{¶ 42} Hudson takes issue in particular with Sweigart's statement regarding being in jail over the holidays. The record reflects that at that time, it was nearing Christmas break for the students. As Hudson was filling out the top portion of the *Miranda* form, Sweigart explained that he was trying to give Hudson the chance to tell him what really happened. The follow statement by Sweigart occurred:

Because that's the best thing at this point because I've got enough to charge you if I wanted to right now. Ok? I'm trying to do it to give you time and you know, if I took you in jail now, you are going to be in jail through the holidays before this will all get worked out. You know how that works. If I do it my way this today and if we go through all this, I'm just going to say, ok you'll be contacted when I need to talk to you again. So, it's that or you may get a notice to appear in court. It's all a matter of getting the video back too is the other thing and seeing where the videos could be because the victim may decide that's all she wants is for me to get the video and get it shut down. Do you know what I'm saying? Get the copies of it. I don't know [until I] get everybody involved. I've already talked to her and she's not very happy but I don't know what she is gonna want to do, ok?

Hrg. Tr. 21; State's Ex. 1.

{¶ 43} We do not find that the above statement constituted a threat of jail or that it

coerced Hudson into giving an involuntary statement. Sweigart explained that although he could take Hudson to jail, he was trying to avoid taking Hudson to jail. It is also of consequence that the procedure Sweigart informed Hudson of did in fact occur: he was not arrested and the next contact by the State on the case was Hudson's being summoned to appear in court.

{¶ 44} Even if Sweigart's comments arguably constituted a threat to arrest Hudson, because Sweigart could have lawfully arrested him, threatening to do so was not a coercive tactic. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 72 (threat to arrest a person during an interview is not coercive and does not render a confession involuntary if the police had probable cause to arrest the person in question). "Probable cause [to arrest] exists when there are facts and circumstances within the police officer's knowledge that are sufficient to warrant a reasonable belief that the suspect is committing or has committed an offense." *State v. Steele*, 138 Ohio St. 3d 1, 2013-Ohio-2470, 3 N.E.3d 135, ¶ 26, citing *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). As Sweigart explained during the interview, the victim in the uploaded video identified when and where the video had been taken and explained that it had been done without her consent. She also identified Hudson as being an individual who had had access to her bathroom during the time in question as he was her roommate's boyfriend. Additionally, Sweigart had had copies of the videos along with Pornhub records showing that the videos had been uploaded using Hudson's account and an IP address that was consistent with Hudson's Columbus address. Based on the information Sweigart had at the time of the interview, he had probable cause to arrest

Hudson.

{¶ 45} While not necessary, a look at the totality of the circumstances further demonstrates that Hudson's will was not overborne by coercive police conduct. At the time of the interview, Hudson was 24 years old, had graduated college, and was attending post-graduate studies for a Master's degree. On the pre-interview form, Hudson wrote his name, address, date, location, and time, demonstrating that he was alert and oriented. Hudson responded appropriately to Sweigart's questions, and he asked Sweigart relevant and coherent questions. Hudson was never deprived of food or water or a bathroom break and was not physically touched other than a simple hand shake. Sweigart informed Hudson of his *Miranda* warnings both orally and in writing, and Hudson initialed on the form that he understood. Hudson never indicated he wished to leave or to stop speaking with Sweigart and was cooperative throughout the interview. The tone of the interview was generally conversational and lasted approximately one hour. Hudson never appeared confused, under duress, or incapable of understanding the conversation. Likewise, Hudson never indicated that he did not feel well enough to speak with Sweigart or that he had been negatively affected by any medication he may or may not have taken. During the interview Hudson revealed that his illness was ulcerative colitis, a stomach disease, but he also indicated that he was getting it taken care of. Although there was testimony that Hudson had previously been in the hospital, the fact that he had participated in a dissertation prior to meeting with Sweigart implied that he was capable of making voluntary statements. There was also no evidence of what medication he had taken, if any, and whether that had any effect on his mental abilities.

{¶ 46} Upon review of the evidence before us, we cannot say that Hudson's will was overborne or his capacity for self-determination was critically impaired due to coercive police tactics. Accordingly, Hudson's statements were voluntarily obtained.

## V. Invocation of Right to Counsel

{¶ 47} The Sixth Amendment right to counsel is premised on the guarantee that an accused has a right to the assistance of counsel for his or her defense in all criminal prosecutions. The Sixth Amendment right to counsel does not attach until the initiation of adversarial judicial criminal proceedings, such as a formal charge, a preliminary hearing, an indictment or information, or an arraignment. *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). "The Sixth Amendment right to counsel attaches only at the initiation of adversary criminal proceedings * * * and before proceedings are initiated a suspect in a criminal investigation has no constitutional right to the assistance of counsel." (Citation omitted.) *Davis v. United States*, 512 U.S. 452, 457, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

{¶ 48} In contrast, the Fifth Amendment right to counsel is based on the guarantee that one cannot be compelled to incriminate oneself. This right applies to any custodial interrogation regarding a suspected crime to counteract the "inherently compelling pressures" of custodial interrogation. *Miranda*, 384 U.S. at 467, 86 S.Ct. 1602, 16 L.Ed.2d 694. The Fifth Amendment right to counsel attaches when an individual is subjected to custodial interrogation regardless of whether a prosecution has commenced. *State v. Echols*, 128 Ohio App.3d 677, 702, 1 N.E.3d 441 (1st Dist.1998), citing *McNeil* at 178.

{¶ 49} In this case, Hudson had not yet been charged for any offense at the time of his interview, thus his Sixth Amendment right to counsel had not yet attached. Likewise, because we have previously determined that Hudson was not subjected to a custodial interrogation, his Fifth Amendment right to counsel had not attached, and Hudson had no constitutional right to have an attorney. *See State v. Baker*, 2d Dist. Champaign No. 2004-CA-19, 2005-Ohio-46, ¶ 36 ("Because [the defendant] was not in custody, [the detective] was not required to provide him with *Miranda* warnings, and [the defendant] had no constitutional right to have an attorney present during the non-custodial questioning.") Consequently, Hudson's non-custodial statements made during the interview were not subject to suppression under either the Fifth or Sixth Amendment right to counsel.

{¶ 50} That said, Hudson never unambiguously invoked his right to counsel even if his right to counsel had attached. "When a suspect invokes his right to counsel, police officers must cease interrogation until counsel is present." *State v. Adams*, 144 Ohio St. 3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 171, citing *Edwards v. Arizona*, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). "A request for an attorney must be clear and unambiguous such that a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to counsel." *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 57 (2d Dist.), citing *Davis*, 512 U.S. at 459, 114 S.Ct. 2350, 129 L.Ed.2d 362. "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis* at 461-62. Whether a suspect has unequivocally invoked his

right to counsel is an objective inquiry. *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 37, citing *Davis* at 459.

{¶ 51} During the interview, Hudson asked Detective Sweigart "Should I talk to a lawyer or something?" Sweigart responded, "That's up to you, but again, we can stop right now and you can talk to a lawyer. That changes the way I have to deal with it, you know?" Sweigart testified that he did not understand Hudson to be asking for a lawyer and he did not intentionally cut off Hudson's train of thought immediately thereafter. Hudson made no other statements during the interview indicating his desire to have counsel present or to cease talking. In a situation involving similar language, this Court has found that the question "Do I need an attorney?" is ambiguous and not an invocation of the right to counsel. *State v. Taylor*, 144 Ohio App.3d 255, 759 N.E.2d 1281 (2d Dist.2001). Accordingly, Hudson's second assignment of error is overruled.

## VI. Seizure and Search of Cell Phone

{¶ 52} In his final assignment of error, Hudson challenges the trial court's decision overruling his motion to suppress evidence obtained from his cell phone. He first claims that his phone was illegally seized during the interview absent a search warrant or exigent circumstances, and secondly, that he did not knowingly, intelligently, and voluntarily consent to the search of his phone. Hudson further argues that because his phone was illegally obtained, evidence obtained in the subsequent search of his phone was subject to suppression as being "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (evidence is inadmissible if it is the fruit of an unconstitutional search or seizure). In the alternative, Hudson argues that even if

his phone was lawfully obtained, the search warrant was defective.   We find no merit to Hudson's arguments.

### a.  Seizure

{¶ 53} The Fourth Amendment to the United States Constitution, as well as Article I, Section 14, of the Ohio Constitution, prohibit unreasonable searches and seizures. *State v. Kinney*, 83 Ohio St.3d 85, 87, 698 N.E.2d 49 (1998).   "For a search or seizure to be reasonable under the Fourth Amendment, it must be based upon probable cause and executed pursuant to a warrant."   (Citations omitted) *State v. Moore*, 90 Ohio St.3d 47, 49, 734 N.E.2d 804 (2000).   "Probable cause exists when there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.' "   *State v. Evans*, 2d Dist. Montgomery No. 20794, 2006-Ohio-1425, ¶ 33, quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

{¶ 54} Warrantless searches and seizures are per se unreasonable, absent a few specifically established and well-delineated exceptions.   *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).   "Exigent circumstances" is one of those well-recognized exceptions.   "Generally, the exigent-circumstances exception to the Fourth Amendment's warrant requirement can apply when the delay associated with obtaining a warrant would result in endangering police officers or other individuals, or would result in concealment or destruction of evidence."   *State v. Johnson*, 187 Ohio App.3d 322, 2010-Ohio-1790, 931 N.E.2d 1162, ¶ 14 (2d Dist.).   The United States Supreme Court has recognized only a few emergency conditions that qualify as exigent circumstances, one of which is to "prevent the imminent destruction of evidence."

*Carpenter v. United* States, __ U.S. __, 138 S.Ct. 2206, 2222-2223, 201 L.Ed.2d 507 (2018). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.' " *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).

{¶ 55} "Different interests are implicated by a seizure than by a search. * * * A seizure affects only the person's possessory interests; a search affects a person's privacy interests." (Citations omitted.) *Segura v. United States*, 468 U.S. 796, 806, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). "Because the nature of a seizure is generally less intrusive than a search, the United States Supreme Court has frequently approved a warrantless seizure of property on the basis of probable cause, for the time necessary to secure a warrant." *State v. Hidey*, 5th Dist. Tuscarawas No. 2016 AP 03 0017, 2016-Ohio-7233, ¶ 13, citing *Segura* at 806. This Court has likewise found that the warrantless seizure of a defendant's cell phone did not violate the Fourth Amendment where the detective had probable cause to believe evidence of a crime was on the phone and there was "a concern that relevant information memorialized on the phone would be deleted or lost." *State v. Cunningham*, 2d Dist. Clark No. 2010-CA-57, 2012-Ohio-2794, ¶ 29-30.

{¶ 56} In this case, Hudson admitted that the videos in question were on his cell phone, which was sitting on the table directly in front of him. When Sweigart asked Hudson how he put the videos onto Pornhub, Sweigart asked if Hudson had it on his phone. Hudson stated "yes." When Sweigart followed up to verify if it was "on this phone?," meaning the cell phone sitting on the table in front of Hudson, Hudson confirmed it was. Based on Hudson's admissions, we find that a fair probability existed that contraband or evidence of the crime would be found on Hudson's phone. Immediately

after Hudson indicated the videos were on his phone, Sweigart informed him that he would need to keep the phone and remove the videos. Hudson offered to show Sweigart the videos on his phone in order to delete them, which Sweigart declined. Had Sweigart allowed Hudson to leave, still in possession of his phone, in order to obtain a warrant, Hudson easily could have destroyed the evidence, particularly considering that he knew exactly what Sweigart was looking for, perhaps even thinking that he was helping Sweigart. After seizing Hudson's phone, Sweigart put the phone in "airplane" mode to prevent remote destruction of any of the evidence, doing only what was necessary to preserve the contents of the phone. See *State v. Brewster*, 157 Ohio App.3d 342, 2004-Ohio-2722, 811 N.E.2d 162, ¶ 31-32 (1st Dist.) (holding that the warrantless seizure of evidence was permissible under the exigent circumstances exception to the Fourth Amendment where law enforcement officers took only that action which "was necessary to preserve the evidence, and no more").

{¶ 57} Prior to Hudson's admissions, Sweigart was unaware where the evidence was located and therefore could not have obtained a search warrant for Hudson's phone in advance of the interview. Moreover, because Sweigart did not search Hudson's phone until after obtaining a search warrant the following day, the State's interest in preventing the potential destruction of evidence was sufficiently addressed by the temporary seizure of the phone. Because the ultimate touchstone of the Fourth Amendment is reasonableness, we conclude that Sweigart's actions were reasonable, and no Fourth Amendment violation occurred. Although the trial court found that Hudson had consented to the seizure of his phone, we need not consider whether his consent

was valid because Sweigart lawfully seized the phone without Hudson's consent.

### b. Search

{¶ 58} Having found that the seizure of Hudson's phone was lawful, we must next determine whether the search of the phone was lawful. "Once the cell phone is in police custody, the state has satisfied its immediate interest in collecting and preserving evidence and can take preventive steps to ensure that the data found on the phone are neither lost nor erased. But because a person has a high expectation of privacy in a cell phone's contents, police must then obtain a warrant before intruding into the phone's contents." *State v. Smith*, 124 Ohio St. 3d 163, 2009-Ohio-6426, 920 N.E.2d 949, ¶ 23.

{¶ 59} Here, a search warrant was obtained the morning after Detective Sweigart obtained Hudson's cell phone. No search of the phone occurred between the time the phone was confiscated and the time the search warrant was granted.

{¶ 60} "The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution provide that search warrants may only be issued upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and/or things to be seized." *State v. Ojezua*, 2d Dist. Montgomery No. 28118, 2020-Ohio-303, ¶ 29. In "determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v.*

*George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph one of the syllabus, quoting *Gates*, 462 U.S. at 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527. When reviewing the sufficiency of probable cause for the issuance of a search warrant, an appellate court should not substitute its judgment for that of the magistrate by conducting a de novo determination of sufficiency. *George* at paragraph two of the syllabus. Rather, "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed," and it "should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *Id.*

{¶ 61} A search warrant and its supporting affidavits enjoy a presumption of validity. *Franks v. Delaware*, 438 U.S. 154, 155-156, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). When a motion to suppress attacks the validity of a search conducted pursuant to a warrant, the burden of proof is on the defendant to establish that evidence obtained pursuant to the warrant should be suppressed. *State v. Carter*, 2d Dist. No. 2011-CA-11, 2011-Ohio-6700, ¶ 11. "To successfully attack the veracity of a facially sufficient search warrant affidavit, a defendant must show by a preponderance of the evidence that the affiant made a false statement, either 'intentionally, or with reckless disregard for the truth.' " *State v. Waddy*, 63 Ohio St.3d 424, 441, 588 N.E.2d 819 (1992), quoting *Franks* at 155-156. " 'Reckless disregard' means that the affiant had serious doubts about the truth of an allegation." *State v. McKnight*, 107 Ohio St. 3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 31, citing *United States v. Williams*, 737 F.2d 594, 602 (7th Cir.1984). Omissions may be deemed false statements if they are designed to mislead or made in

reckless disregard to the fact that they may mislead the issuing magistrate. *Id.* at ¶ 31, citing *United States v. Cokley*, 899 F.2d 297, 301 (4th Cir.1990). "Before an omission can be considered material the defendant must show that the omission would have materially influenced the magistrate such that if the omission had been included in the affidavit it would have negated probable cause for issuance of the warrant." *State v. Wilhelm*, 6th Dist. Lucas No. L-83-014, 1983 WL 6941, *1 (Sept. 2, 1983).

**{¶ 62}** We have previously cited with approval *Mays v. City of Dayton*, 134 F.3d 809 (6th Cir.1998), which held that "a *Franks* hearing based on omissions from an affidavit in support of a search warrant is merited 'only in rare instances' because 'affidavits with potentially material omissions, while not immune from *Franks* inquiry, are much less likely to merit a *Franks* hearing than are affidavits including allegedly false statements.' " *State v. Blaylock*, 2d Dist. Montgomery No. 24475, 2011-Ohio-4865, ¶ 15, quoting *Mays* at 815. The Sixth Circuit noted that because affidavits are drafted in the midst and during the rush of a police investigation, "an affiant cannot be expected to include every piece of information gathered in the course of an investigation." *Mays* at 815. The Sixth Circuit set forth the following test for omissions triggering a *Franks* inquiry, which we adopted: " '[E]xcept in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts.' " (Emphasis sic.) *Blaylock* at ¶ 15, quoting *Mays* at 816. In applying this test, we must first analyze whether Hudson has shown that the affiant omitted critical information with an intent to mislead the magistrate who issued the search

warrant.

**{¶ 63}** If the affidavit's content with the false statement removed or with the omitted information included is insufficient to support a finding of probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks* at 156. Alternatively, if the false statements are set to one side, or the omitted information is included, and there is sufficient support for a finding of probable cause, the warrant will be upheld. *State v. Sells*, 2d Dist. Miami No. 2005-CA-8, 2006-Ohio-1859, ¶ 11.

**{¶ 64}** The portion of the search warrant that Hudson challenges on appeal reads as follows:

> I contacted Mr. Hudson and set up an interview. I then interviewed Mr. Hudson after he was read and waived his rights. Mr. Hudson admitted to me that he had placed the charger/camera in the bathroom of 414 Kiefaber Street Dayton Montgomery County Ohio. Mr. Hudson admitted to video tapping [sic] the victim [S.D.] in this case out of revenge. Mr. Hudson also admitted that he uploaded the video to porn hub website as a revenge because the victim had always treated him and his girlfriend bad.
>
> Mr. Hudson also advised me that the video clips were on his cell phone that he had with him. I asked Mr. Hudson for permission to search the cell phone and he gave me written permission to search the cell phone. I was also given the pass code for the phone by Mr. Hudson as well. I then took possession of the cell phone after placing it on airplane mode. I advised

Mr. Hudson that the phone would be copied and reviewed.

{¶ 65} Hudson contends that Detective Sweigart omitted material facts in the search warrant that would have prevented a finding of probable cause. Hudson argues that the affidavit misrepresents the facts by failing to include: (1) Hudson's efforts to understand his right to counsel; (2) that he was tricked into providing his passcode; (3) that Sweigart lied to him about jail to overcome his will and obtain incriminating statements; (4) that his phone was seized prior to Sweigart's obtaining consent; and (5) that when Hudson asked if there "was another way," rather than giving up his phone, Sweigart told him "no." Hudson also takes issue with Sweigart's use of the word "revenge" in the affidavit.

{¶ 66} The question before the issuing judge was whether a fair probability existed that the illegally recorded pornographic videos were on Hudson's phone. *George*, 45 Ohio St.3d 325, 544 N.E.2d 640, at paragraph one of the syllabus (probable cause to search requires a showing that there is a fair probability that contraband or evidence of a crime will be found in a particular place). Considering all the evidence in the affidavit, the issuing judge had a substantial basis for finding probable cause to believe the videos in question were on Hudson's phone. Hudson was interviewed by Sweigart and admitted that he uploaded the videos to Pornhub using his cell phone and that the videos were still on his phone, which was within Sweigart's possession.

{¶ 67} We have previously concluded that Hudson was not in custody so it was unnecessary for Sweigart to provide *Miranda* warnings. Nonetheless, the record reflects that Hudson was read his *Miranda* warnings, which he acknowledged on the signed form

mentioned by Sweigart in the affidavit. Moreover, Hudson's right to counsel had not attached under either the Fifth Amendment or Sixth Amendment. Therefore, the validity of Hudson's *Miranda* waiver or his efforts to understand his right to counsel were not relevant or material facts for the issuing magistrate to evaluate to determine probable cause.

{¶ 68} Likewise, whether Hudson consented to Sweigart's confiscating his cell phone was immaterial as Sweigart could have lawfully seized the phone without Hudson's consent. Even still, Hudson did sign a consent to seize and search his phone, which supported Sweigart's search warrant affidavit statement. Further, we concluded above that Hudson's will was not overborne to make his statements involuntary. Therefore, the alleged "omissions" were not material facts omitted for the purpose of misleading the issuing magistrate.

{¶ 69} The facts as Sweigart portrayed were, for the most part, accurate. In reviewing the recorded interview, it is clear that Hudson signed the consent to search form prior to Sweigart's physically taking Hudson's phone. Before that time, the phone was sitting on the table in front of Hudson, and Sweigart had not touched it in any way. Although Hudson gave Sweigart his passcode to the phone when asked, it was not until after Sweigart had already physically seized the phone. However, even though Sweigart initially seized the phone, he still allowed Hudson access to the phone in order to obtain his girlfriend's phone number. The phone was then retained by Sweigart and placed on airplane mode so that nothing could be deleted from it. Thus, while the timeline of events for the passcode and the seizure of the phone were not entirely precise, we do not

conclude that this was a false statement made intentionally or with reckless disregard for the truth. But more importantly, even if this had been clarified in the affidavit, it would not detract from the probable cause finding that the evidence was reasonably likely to be found on Hudson's phone and that Sweigart had possession of the phone.

{¶ 70} Lastly, as to Sweigart's use of the word "revenge," Sweigart testified that he believed it was consistent with what Hudson had said during the interview. Sweigart explained that it was his recollection at the time he typed the search warrant that Hudson admitted to taping the victim and posting it online because he was mad at her. The use of the word "revenge" was therefore based on Hudson's resentment toward the victim. During the interview, Hudson did state that he was mad at the victim, because she gave him a hard time and was mean to him and his girlfriend. However, when asked if the videos were posted "to get even," Hudson responded "not really." We agree that the word choice may not have been the most appropriate and that it would have been preferable to use the language actually utilized by the individual whose statements were used in the affidavit. Nevertheless, we do not agree with Hudson that under these circumstances the use of the term "revenge" was intentionally false or designed to mislead the magistrate. As far as determining probable cause to issue the search warrant, Hudson's motive for committing the offenses was not material to the issue of probable cause. So long as the issuing magistrate could find that there was a substantial basis to believe that the evidence was located in the place to be searched, then the search warrant was valid. The affidavit in this case supported a finding of probable cause.

{¶ 71} Having found that the search warrant was valid, we need not consider the

validity of Hudson's consent to search his phone. We overrule his third assignment of error.

### VII. Conclusion

**{¶ 72}** Having overruled each of Hudson's three assignments of error, we affirm the judgment of the trial court. Further, because the judgment is affirmed, we lift the stay of his sentence previously granted.

. . . . . . . . . . . . .

TUCKER, P. J. and DONOVAN, J., concur.

Copies sent to:

Stephanie L. Cook
Andrew D. Sexton
Alissa C. Schriner
Bryan K. Penick
Joanna W. Gisel
Hon. Carl S. Henderson