Dewey O. MAYS, Jr., M.D., et al., Plaintiffs–Appellees,

v.

CITY OF DAYTON, et al., Defendants–Appellants.

No. 96–3464.

United States Court of Appeals, Sixth Circuit.

Argued June 3, 1997.

Decided Jan. 23, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied March 6, 1998.

Charles A. Smiley, Jr. (argued and briefed), Charles Smiley & Associates, Dayton, OH, for Plaintiffs–Appellees.

Jane M. Lynch (briefed), Neil F. Freund (argued), Lisa A. Hesse (briefed), Freund, Freeze & Arnold, Dayton, OH, for Defendants–Appellants.

Before: SILER and COLE, Circuit Judges, and WISEMAN, District Judge.*

WISEMAN, D.J., delivered the opinion of the court, in which SILER, J., joined. COLE, J. (p. 817), delivered a separate concurring opinion.

---

* The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

## OPINION

WISEMAN, District Judge.

Appellant, Gary Gabringer, appeals the district court's denial of his summary judgment motion based upon qualified immunity and a failure to find probable cause for a search warrant Gabringer executed. For the reasons stated below, we **REVERSE** the judgment of the district court.

### I.

This appeal stems from a search of the place of business of Dr. Dewey O. Mays, Jr. (Dr. Mays).[1] Dr. Mays practices medicine from an office at 2114 Salem Street in Dayton, Ohio. Dr. Mays treats a substantial number of Medicare and workman's compensation benefit recipients. Claims for payment for services rendered to Medicare and workman's compensation patients must be submitted in accordance with U.S. Department of Health and Human Services regulations. Dr. Mays employs his wife, Ruby Mays, and his sister-in-law, Doris Jenkins, in his medical office. In 1989, Dewey O. Mays, III ("Mays III"), Dr. Mays' son, began assisting his father in the practice. Although Mays III had not obtained a license to practice medicine in Ohio, he was licensed to practice medicine in Tennessee and Kentucky.

In February 1989, Detective Gary Gabringer of the Dayton Police Department received information that Mays III was trafficking in pills and drug prescriptions. Detective Gabringer corroborated this information through an undercover investigation during which Detective Gabringer received pills from Mays III in return for stereo equipment and observed Mays III writing prescriptions on Dr. Mays' prescription pads. During the course of the investigation, Detective Gabringer became aware of a simultaneous federal investigation of Dr. Mays for Medicare fraud under the direction of Agent Craig Morton of the U.S. Department of Health and Human Services.

---

1. At the time of the events that provide the basis for this appeal, Dr. Mays was practicing medicine in Dayton. Dr. Mays died while this appeal was pending.

Mays III was arrested on December 6, 1989, for aggravated drug trafficking, schedule II cocaine. Subsequent to his arrest, Mays III told police that his father routinely wrote prescriptions for patients seen only by Mays III, that some of these patients were Welfare/Medicare patients, and that Medicare was sometimes billed for office visits when patients received prescription renewals without being seen by Dr. Mays. On December 8, 1989, pursuant to a warrant, police searched 2114 Salem Street and seized the files of thirty patients who Mays III indicated were his patients. One of these files was that of Leon Ralston whose name had appeared on prescriptions sold to Detective Gabringer during the course of the investigation.

Accompanied by Agent Morton, Detective Gabringer interviewed several of these patients. They verified that they had received prescriptions from Dr. Mays based on an initial examination by Mays III and that their prescriptions were often refilled without examination. In addition, one patient and his attorney indicated that they had received copies of the patient's file which contained some discrepancies indicating that the file had been altered.

In March 1990, Detective Gabringer applied for a second warrant to search 2114 Salem Street for Medicare and workman's compensation files, as well as appointment books showing patient appointments from January 1, 1988 to present. The affidavit filed in support of this application indicated that at least three offenses had occurred: (1) practice of surgery or medicine without a license; (2) Medicare fraud; and (3) trafficking in drugs. A list of 502 patient files derived from claims made for payment in Medicare and workman's compensation cases was attached to the application.

As a basis for Detective Gabringer's belief that he had probable cause to search 2114 Salem Street, Gabringer recounted a number of pertinent facts in his affidavit supporting the second search warrant application.[2] Based on this information, a Dayton Municipal Court judge determined that probable cause existed and authorized a warrant to search the premises of 2114 Salem Street. The search warrant was executed under the direction of Detective Gabringer on March 29, 1990, resulting in the seizure of the designated 502 patient files and records of patient appointments for the preceding fifteen months.

Dr. Mays, Ruby Mays, and Doris Jenkins filed suit under 42 U.S.C. §§ 1981, 1983, 1986 and 1988, claiming that this search and police surveillance before and after the search violated their rights under 42 U.S.C. §§ 1981, 1983, 1986, 1988 and the Fourth, Fifth, and Fourteenth Amendments. Plaintiffs allege that these violations occurred when police searched Dr. Mays' medical office, as they did not have probable cause and as they conducted the search in an unreasonable manner. Named as Defendants were Gabringer, the City of Dayton, James E. Newby (Dayton's former Chief of Police), Dewey O. Mays III, and Tim Sucher.

Gabringer, Newby, and the City of Dayton ("the Dayton Defendants") moved for summary judgment on a number of grounds, including Gabringer's entitlement to qualified immunity. The district court denied summary judgment on the qualified immunity issue, finding that Gabringer was not entitled to qualified immunity because: (1) the affidavit filed by Gabringer in application for the search warrant failed to establish, as a mat-

---

2. These facts included: Mays III's statement to police that his father (Dr. Mays) routinely wrote out prescriptions for patients he did not examine personally; Mays III's statement that Medicare claims were filed for patients who came to the office and received prescriptions without being seen by Dr. Mays; files seized in the earlier search of 2114 Salem Street indicated that patients seen and/or examined by Mays III included both workman's compensation and Medicare claimants; Leon Ralston's file indicated that a claim had been made for an intermediate office visit on July 31, 1989, although the notation for that date indicated only "prescriptions"; interviews with patients verified that, although prescriptions were received from Dr. Mays, the patients were seldom seen or examined by Dr. Mays; written information received from a "reliable" source stated that a third person, a Medicare patient known to the source, received prescriptions from Dr. Mays without seeing him or, if seen by Dr. Mays, without being examined by him; and other relevant facts.

ter of law, probable cause that Dr. Mays committed one of the offenses being investigated; (2) a genuine issue of material fact existed as to whether the omission of allegedly exculpatory material from the affidavit violated the rule established in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); and (3) the 'plaintiffs' submission of affidavits by patients who observed police surveillance of Dr. Mays' office and heard disparaging remarks about the plaintiff and his patients by unidentified police officers was sufficient to raise a genuine issue of material fact as to whether the Dayton Defendants continued to harass, intimidate, or threaten plaintiffs after the March 1990 search.

Detective Gabringer now appeals to this Court that portion of the district court's judgment which held that he was not entitled to summary judgment on the basis of qualified immunity. For the reasons that follow, we reverse the judgment of the district court on this issue and grant summary judgment in favor of Gabringer.

## II.

This court reviews the denial of summary judgment on grounds of qualified immunity *de novo,* as application of this doctrine is a question of law. *Mumford v. Zieba,* 4 F.3d 429, 432 (6th Cir.1993).

■ While acting in his role of law enforcement officer, Gabringer presumptively receives immunity for acts committed in the course of his duties. "[G]overnment officials who perform discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This "objective reasonableness" standard focuses on whether the defendant reasonably could have thought his actions were consistent with the rights that plaintiffs claim have been violated. If the government official has acted in a manner reasonably consistent with plaintiff's rights, qualified immunity protects that official from civil suit resulting from those actions. In

this circuit, immunity questions are resolved at the earliest possible stage of litigation. *Poe v. Haydon,* 853 F.2d 418, 426 (6th Cir. 1988).

■ To overcome a defendant's motion for summary judgment based upon qualified immunity, the plaintiff must: (1) identify a clearly established right alleged to have been violated; and (2) establish that a reasonable officer in the defendant's position should have known that the conduct at issue was undertaken in violation of that right. *Pray v. Sandusky,* 49 F.3d 1154, 1158 (6th Cir. 1995). In reviewing a qualified immunity determination, this Court must first determine whether plaintiffs have stated a claim against the defendant pursuant to 42 U.S.C. § 1983, demonstrating the violation of a constitutional right. If the court finds no valid claim pursuant to 42 U.S.C. § 1983, the court need not reach the issue of qualified immunity. *Carlson v. Conklin,* 813 F.2d 769 (6th Cir.1987). In this case, if the court determines that Detective Gabringer had probable cause sufficient to obtain a search warrant, plaintiffs' § 1983 claim fails, and the issue of whether Detective Gabringer receives qualified immunity becomes moot.

To assert a § 1983 claim, a plaintiff must prove that he was deprived of a right secured by the Constitution or the laws of the United States and that the deprivation was caused by a person who was acting under color of state law. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155–57, 98 S.Ct. 1729, 1733–34, 56 L.Ed.2d 185 (1978). In the instant case, this requires a determination of whether plaintiffs' Fourth Amendment rights were violated as a result of the March 29, 1990 search of 2114 Salem Street. The search violated plaintiffs' rights only if the search warrant executed on March 29, 1990 was not supported by probable cause.

## III.

■ Plaintiffs claim that the March 29, 1990 search of Mays Jr.'s office violated their Fourth Amendment right to be free from unreasonable searches and seizures due to an insufficient showing of probable cause in obtaining the warrant for that search. We find

that Detective Gabringer did have probable cause sufficient to obtain a search warrant, contrary to the holding of the district court.

Probable cause for a search warrant exists if "the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir.1996) (quoting *United States v. Besase*, 521 F.2d 1306, 1307 (6th Cir.1975)).

In a lengthy analysis, the district court determined that Detective Gabringer's affidavit did not contain information sufficient to support the probable cause necessary to obtain a search warrant. In so holding, the court cited the absence of adequate links between the alleged crimes, Dr. Mays, and the evidence sought in the search. Because the district court found that the affidavit did not contain information on the nature of the illegal drugs, nor on the probability that all 502 seized files could contain evidence of Medicare fraud, nor that the files had any connection to Mays III, the court concluded that probable cause for the search warrant was not demonstrated. *Mays v. City of Dayton*, No. C–3–92–002, slip op. at 15 (S.D.Ohio March 18, 1996).

■■■ The district court based its analysis of probable cause upon an erroneous understanding of the law. The specificity required by the Fourth Amendment is *not* as to the person against whom the evidence is to be used but rather as to the place to be searched and the thing to be seized. *U.S. v. Besase*, 521 F.2d 1306, 1307 (6th Cir.1975) (internal citations omitted). When reviewing an application, courts must bear in mind that search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found. *Zurcher v. Stanford Daily*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). The affidavit in support of the warrant need not present information that would justify the arrest of the individual in possession of or in control of the property. *Id.* The owner of the property to be searched need not be suspected of having committed a crime. *Id.* Property owned by a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant. *Id.*

■■■ A determination of probable cause simply requires consideration of whether there were reasonable grounds to believe at the time of the affidavit that the law was being violated on the premises to be searched. *U.S. v. Eisner*, 297 F.2d 595, 596 (6th Cir.), *cert. denied*, 369 U.S. 859, 82 S.Ct. 947, 8 L.Ed.2d 17 (1962); *see also U.S. v. Loggins*, 777 F.2d 336, 338 (6th Cir.1985) (probable cause exists when there is a fair probability, given the totality of the circumstances that contraband or evidence of a crime will be found in a particular place).

The district court erred in determining that the lack of evidence that Dr. Mays personally committed a crime invalidated the search warrant. All that the magistrate must find in order to issue a warrant is probable cause that evidence of a crime would be found at the site to be searched.

In determining whether a warrant is supported by probable cause, this Court pays "great deference" to the issuing magistrate's determination as to probable cause and recognizes that such a finding should not be set aside unless arbitrarily exercised. *U.S. v. Goff*, 6 F.3d 363, 366 (6th Cir.1993); *see also Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (determination by the issuing magistrate judge will be upheld so long as the magistrate judge had a substantial basis for concluding that a search would uncover evidence of wrongdoing).

Upon *de novo* review and with proper deference to the issuing judge's determination of probable cause, we find that the warrant to search 2114 Salem Street was supported by probable cause. Specifically, regulations governing Medicare claims, statements made by Mays III and various patients concerning office practices, as well as discrepancies between medical activity noted in files previously seized and claims filed, indicate that the claims filed by Dr. Mays's office did not comply with the pertinent regulations. Accordingly, the search did not violate the plaintiffs' constitutional rights and we need

not reach the issue of Detective Gabringer's qualified immunity.

## IV.

As an alternative basis for denying summary judgment, the district court held that a genuine issue of material fact existed as to whether the affidavit failed to include potentially exculpatory information in violation of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The district court found that Detective Gabringer's omission of the fact that he had attempted unsuccessfully to get Dr. Mays to write a prescription for him and his wife raised the potential of a *Franks* violation. It also held that whether or not the warrant without the omitted fact showed probable cause was a question of material fact, preempting the granting of summary judgment.

In *Franks*, the Court held that a party may only challenge the veracity of an affidavit if that party can make a "substantial preliminary showing that a false statement knowingly and intentionally or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and that the allegedly false statement was necessary for a finding of probable cause. *Id.* at 155, 156, 98 S.Ct. at 2675, 2676–77. The inquiry does not continue if the court finds that the exclusion of the allegedly false statement does not result in a lack of probable cause. If the party succeeds in meeting this burden, the party is entitled to a hearing to determine if a preponderance of the evidence supports the allegations of lack of veracity. *Id.* While this case does not involve any allegedly false statements, we have previously held that the *Franks* doctrine applies to omissions of information from affidavits as well. *United States v. Bonds*, 12 F.3d 540, 568–69 (6th Cir.1993).

A *Franks* hearing may be merited when facts have been omitted in a warrant application, but only in rare instances. This Court recently held in *U.S. v. Atkin*, that affidavits with potentially material omissions, while not immune from *Franks* inquiry, are much less likely to merit a *Franks* hearing than are affidavits including allegedly false statements. *U.S. v. Atkin*, 107 F.3d 1213, 1217 (6th Cir.1997). This court reasoned that allowing omissions to be challenged would create a situation where almost every affidavit of an officer would be questioned. *Id.*

Rather than apply a *Franks* analysis, the district court, apparently misconstruing the meaning of *Franks*, imputed the rationale of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), into the warrant application process. This is clear error as the warrant process differs significantly from the trial process.

Affidavits in support of search warrants "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation. *United States v. Colkley*, 899 F.2d 297, 302 (4th Cir.1990). Clearly an affidavit should not be judged on formalities, as long as probable cause is evident.

The district court's inference that the due process protection provided to defendants prior to trial under *Brady* applies to the warrant process under the guise of a *Franks* analysis, thereby entitling the subject of a search warrant to disclosure of any information potentially contradicting a finding of probable cause, particularly concerns this Court. *Brady* and its progeny established the prosecutor's duty to disclose to the defendant exculpatory evidence, defined as material evidence that would have a bearing upon the guilt or innocence of the defendant. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215 (1963); *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976); *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985). This rule, derived from due process, helps to ensure fair criminal trials, protecting the presumption of innocence for the accused, while forcing the state to present proof beyond a reasonable doubt. *Bagley*, 473 U.S. at 675, 105 S.Ct. at 3380; *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97.

By contrast, the probable cause determination in *Franks,* derived from the Fourth Amendment, involves no definitive adjudication of innocence or guilt and has no due process implications. Because the consequences of arrest or search are less severe and easier to remedy than the consequences of an adverse criminal verdict, a duty to disclose potentially exculpatory information appropriate in the setting of a trial to protect the due process rights of the accused is less compelling in the context of an application for a warrant.

The duties imposed by *Brady* and *Franks* differ further. In the *Brady* context, the constitutional obligation to disclose material exculpatory information attaches regardless of the prosecutor's intent and constitutional error can be found without a demonstration of moral culpability. *Agurs,* 427 U.S. at 110, 96 S.Ct. at 2400–01. A *Franks* violation, however, does require a showing of intent, i.e., a "deliberate falsehood" or "reckless disregard for the truth." *Franks,* 438 U.S. at 171, 98 S.Ct. at 2684.

Whereas the "overriding concern" of *Brady* is with the "justice of finding guilt" that is appropriate at trial, *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2401 , *Franks* recognizes that information an affiant reports may not ultimately be accurate, and is willing to tolerate such a result at that early stage of the process, so long as the affiant believed the accuracy of the statement at the time it was made. *Franks,* 438 U.S. at 165, 98 S.Ct. at 2681.

These disparate standards of intent reflect differences in the consequences of error in the two contexts. They also indicate recognition that the non-lawyers who normally secure warrants in the heat of a criminal investigation should not be burdened with the same duty to assess and disclose information as a prosecutor who possesses a mature knowledge of the entire case and is not subject to the time pressures inherent in the warrant process. A statement of these differences does not condone deliberate misrepresentations in the warrant application process. Rather it points out that the obligations shouldered during the adjudication process should not be imposed by inference onto the warrant application process.

To interweave the *Brady* due process rationale into warrant application proceedings and to require that all potentially exculpatory evidence be included in an affidavit, places an extraordinary burden on law enforcement officers, compelling them to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded. Under such a scenario, every search would result in a swearing contest with participants arguing after the fact over whether exculpatory evidence even existed.

For these reasons, as well as to resolve any confusion resulting from prior opinions, we reiterate that except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts.

## V.

The district court also denied summary judgment on plaintiffs' claim that they were harassed and intimidated after the March 29, 1990 search. The district court found, without stating reasons, that affidavits submitted by plaintiffs in opposition to the motion for summary judgment raised a genuine issue of material fact as to whether the Dayton Defendants continued to harass and threaten them after the search. Neither the plaintiffs nor the district court identify what "clearly established" right this claim is related to or if such a right exists in the absence of an illegal search.

A review of the affidavits submitted by the plaintiffs and relied upon by the district court indicates only that the plaintiffs and some of Dr. Mays' patients observed what appeared to be continued police surveillance of 2114 Salem Street. Thus, the denial of summary judgment on this issue necessarily entails a finding that (1) police surveillance constitutes harassment; (2) harassment vio-

lates a clearly established right; and (3) a reasonable police officer would recognize that his conduct in participating in the surveillance of 2114 Salem Street was unconstitutional. We find no basis in the law or record to support any of these findings and accordingly grant summary judgment for the defendant.

## VI.

For the foregoing reasons, the judgment of the district court is **REVERSED** and **REMANDED** to the district court with instructions to enter summary judgment in favor of Detective Gabringer.

COLE, Circuit Judge, concurring.

Although I concur in the majority's opinion, I write separately to address the majority's discussion of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). I do not believe that the district court's thoughtful opinion misconstrued the holding of that case.

The majority states that the district court imputed the rationale of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) into the warrant process. I do agree with the majority's discussion distinguishing the warrant process from the *Brady* protections arising from the trial process; however, I do not believe that the district court attempted to apply *Brady* to the warrant process.

The district court held that a genuine issue of material fact arose as to whether the rule established by the Supreme Court in *Franks* was violated by Detective Gabringer's omission of information in the affidavit. Although I disagree with that holding—I believe that even with the addition of the omitted statements, probable cause existed as a matter of law—I do not read the district court's statements as an attempt to redefine *Franks.*

As the majority states, under *Franks,* the inquiry does not continue if the court finds that the exclusion of the allegedly false statement (or in this case, omission of material information) does not result in a lack of probable cause. I would thus hold that Detective Gabringer's omission of the fact that

he had attempted unsuccessfully to get Dr. Mays to write a prescription for him would not have resulted in a lack of probable cause.