NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0024n.06

Case No. 21-3996

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jan 11, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| JASCHA CHIAVERINI; CHIAVERINI, INC., | ) | |
| Plaintiffs-Appellants, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| CITY OF NAPOLEON, OHIO, et al., | ) ) | |
| Defendants-Appellees. | ) | OPINION |

Before: MOORE, CLAY, and NALBANDIAN, Circuit Judges.

**NALBANDIAN, Circuit Judge.** After Jascha Chiaverini bought stolen jewelry, he faced several demands to return the property. The rightful owners, a police letter, and several officers requested its return. But Chiaverini refused. He instead confronted the chief of police and alluded that he operated his business without a license. Following a police investigation, a municipal judge issued arrest and search warrants against Chiaverini for retaining stolen property, a licensing violation, and money laundering. And a preliminary hearing confirmed the probable cause underlying those charges. After those charges were dropped, Chiaverini filed a 42 U.S.C. § 1983 action, alleging malicious prosecution and false arrest. Because probable cause existed, the district court granted summary judgment on his claims. And we affirm for the same reason.

**I.**

Jascha Chiaverini managed a jewelry store in Napoleon, Ohio called the Diamond and Gold Outlet.[1] One day, he bought a men's ring and a diamond earring from Brent Burns, the purported owner of the jewelry, for $45. Before Burns left, Chiaverini completed a "buy card,"[2] copied Burns' driver's license, and photographed the ring and earring.

That same day, David and Christina Hill called the Outlet, asking if anyone had come in to sell their stolen ring. Chiaverini told them to make a police report, yet David allegedly refused. And Chiaverini denied having bought the ring they described. On the last call, David told Chiaverini, "I know you bought it. . . . "[Y]ou bought it from Brent Burns." At that point, Chiaverini told David that "this conversation is ending."

Both the Hills and Chiaverini called the police. An audio recording captured Chiaverini's conversation. He told a 911 dispatcher that the Hills would call "making a police report on some jewelry." He wanted to avoid "get[ting] into a pissing battle with" the Hills. And he asserted that he was "just trying to be cooperative."

Chiaverini said that he "believe[d] [he] may have [had the Hills'] property." He clarified that he did not know if he had the stolen jewelry, but he wanted "an officer" to come and talk to him, not the Hills.[3] But Chiaverini didn't get what he wanted. David came to the Outlet, and the police followed close behind.

---

[1] Chiaverini, Inc., another plaintiff-appellant, owns that Outlet.

[2] This card lists the biographical information of the seller and a description of the items sold.

[3] Chief Weitzel later stated that this kind of call was common and, in his experience, not necessarily indicative of innocence. He stated that, "I've seen many, many cases where somebody rushes to the phone to make excuses." (R. 93, Weitzel Deposition, PageID 2024.)

Officers David Steward and Nicholas Evanoff arrived on the scene as David "started screaming." David provided Officer Steward with a description of the items and stated that Burns stole them from him earlier that week. At the same time, Officer Evanoff spoke with Chiaverini. Chiaverini provided the officers with photos of the jewelry and gave information on Burns. Before leaving, Officer Evanoff confirmed that the items were stolen and instructed Chiaverini not to sell them.

Officer Steward authored the narrative report on this incident. And later, Steward added "additional details concerning the discussion[.]" One of the updates was a statement that Chiaverini allegedly made to Officer Evanoff. According to Steward, Chiaverini stated that "the reason he bought the ring and kept records regarding the purchase, was because he suspected that it was in fact stolen." In support of this, Officer Evanoff later said that Chiaverini "stated he believed . . . the ring to be stolen" and "[t]hat's why he filled out the buy card, because Brent Burns normally sold him fake jewelry." But Chiaverini denies saying this. So the veracity of Officer Steward's update is in dispute.

Officer Steward justified omitting the statement from the original narrative because at the time "Burns was the suspect, not" Chiaverini. But when Chiaverini himself became a criminal suspect, Officer Steward updated the narrative with what he now believed to be "important information." And Chief Robert Weitzel explained that updating reports in this fashion occurs on a "fairly regular basis." He also noted that the report system automatically provides an audit trail when someone updates a document.

Hoping to return the property to its rightful owners, the police sent a "hold letter" to Chiaverini. Chiaverini thought the letter was internally inconsistent. First, the letter directed him to "hold this item . . . as evidence of the crime of Theft" and to "retain[] the items." Second, it

3

said that Chiaverini should "release these items to David or Christina Hill." Later that day, Christina came to the Outlet and asked for her items. Chiaverini allegedly refused to hand over the jewelry based on the hold letter's different directives.

The police then returned to the Outlet. And they instructed Chiaverini to release the items to the Hills. But Chiaverini refused. He reasoned that it "would have been a criminal act[.]" And his counsel advised him to hold onto the property.

Chiaverini confronted Chief Weitzel outside the police station two days later. Chiaverini asked about the letter's contradictory directives. And Weitzel said he would get back to Chiaverini after meeting with the City's law director. Weitzel recalled that Chiaverini said that he did not need to comply with the hold letter and would not release the items to the Hills. This stance left Weitzel confused, as Chiaverini had always complied in the past.

Chiaverini may have said too much. Chief Weitzel testified that Chiaverini "alluded to the fact that he didn't have a [precious-metal-dealers] license." And Chief Weitzel responded, "I think you have more problems than just this particular ring if you're operating without a license."[4] Before this conversation, Weitzel believed that Chiaverini was licensed under Ohio law as a precious-metals dealer. And when Weitzel found out that Chiaverini wasn't, Weitzel knew that Chiaverini "had no protection under the license." On that basis, Weitzel thought Chiaverini received stolen property without the right to retain it. So the police began another aspect to the investigation. And after reviewing the Ohio Department of Commerce's website, the police found Chiaverini's precious-metals-dealers license inactive.

---

[4] Chiaverini purports that he told Weitzel that state law exempted him from the licensing requirements. As we discuss below, Chiaverini has failed to produce evidence that he was exempt from state-licensing requirements.

Officer Steward sent all relevant police reports to the City of Napoleon Law Director, Billy Harmon. Chiaverini alleges that the police didn't disclose the alterations to Steward's report to Harmon at the time. At any rate, from the files Harmon reviewed, he made warrant templates for the officers to complete. For the templates, Harmon identified Chiaverini's potential criminal offenses as receiving stolen property, operating without a valid license as both a pawnbroker and a precious-metals dealer, money laundering, and engaging in a pattern of corrupt activity.

Officer Evanoff applied for a search warrant. As part of the application, Evanoff signed a Probable Cause Affidavit, stating that Chiaverini "bought a ring while suspecting that it was stolen, and was later informed by the Napoleon Police Department that this item was confirmed stolen." He then stated that Chiaverini "furthered the commission of corrupt activity by refusing the return of this stolen property." And he added that Chiaverini "operat[ed] this business without the proper licens[es]." Evanoff also signed criminal complaints charging Chiaverini with: (1) receiving stolen property (Ohio Rev. Code § 2913.51(A)); (2) Ohio Precious Metals Dealers Act ("OPMDA") licensure violations (Ohio Rev. Code § 4782.02); and (3) money laundering (Ohio Rev. Code § 1315.55(A)(1)).

A municipal judge signed the search and arrest warrants, which prompted the police to search the Outlet and arrest Chiaverini.[5] The officers also seized the Hills' stolen jewelry. And they seized items related to licenses, sales, and purchases of precious metals. After the police arrested Chiaverini, he remained in custody for three days.

---

[5] The judge stated, "I am satisfied that there is probable cause to believe that the above property so described is being concealed on the premises above described and that the foregoing grounds for application for issuance of the search warrant pursuant to Rule 41(b) of the Ohio Rules of Criminal Procedure exist." (R. 102-11, Search Warrant, at 1.)

Ten days later, the same judge who issued Chiaverini's warrants held a preliminary hearing. Officer Evanoff said that he confirmed with Chiaverini that the jewelry was stolen, that the Outlet received a hold letter, and that Chiaverini had bought the jewelry knowing it may be stolen. Chiaverini then explained why he kept the stolen property after the police requested him to release the items. Chiaverini also challenged Evanoff's testimony, stating he never told Evanoff that he believed the items were stolen at the time of purchase. And although Chiaverini confirmed he didn't have a precious-metals-dealers license, he claimed to operate under an exemption. The judge found that probable cause existed and bound over all charges for trial.

Later, however, a court dismissed the criminal case against Chiaverini without prejudice for failure to be timely presented to a grand jury. And the police returned the seized items no later than August 2017.

Chiaverini filed a complaint against Evanoff, Steward, and other individual defendants as well as the City of Napoleon. He alleged, among other things, common law and constitutional violations for unlawful search and seizure, malicious prosecution, and false arrest. The officers moved for summary judgment based on qualified immunity and state-law immunity. Granting summary judgment, the district court made a series of holdings. Most important among them was that probable cause supported the arrest and search warrants against Chiaverini. And because the viability of Chiaverini's claims against the individual defendants all hinged on a lack of probable cause, the court dismissed them. This appeal followed.[6]

---

[6] The district court also held that the City of Napoleon was entitled to summary judgment on Chiaverini's § 1983 claims. The court reasoned that the complaint didn't identify any city policy or custom of deliberate indifference. Because Chiaverini didn't argue the *Monell* claims against the City in his opening brief on appeal, he has forfeited that argument. *See, e.g.*, *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018).

**II.**

We review a district court's grant of summary judgment de novo. *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 297 (6th Cir. 2019). Although we must view evidence in the light most favorable to Chiaverini, he "must set forth specific facts showing that there is a genuine issue for trial" to withstand summary judgment. *Zakora v. Chrisman*, 44 F.4th 452, 464 (6th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

**III.**

The district court found that no constitutional violation occurred, and so, qualified immunity barred Chiaverini's claim against the individual defendants. Qualified immunity is a two-pronged test, and we can address either prong first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). To overcome qualified immunity, a plaintiff must "show [that] the officer's conduct violated a constitutional right" and that the right was "clearly established." *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) (citation omitted). This appeal concerns the first of those two issues. And we hold that no constitutional violation occurred because probable cause supported the arrest and search warrants.

Chiaverini makes several claims. But all fall short for a simple reason: Probable cause justified the search, arrest, and prosecution. In reaching this decision, we ask whether the judge arbitrarily exercised her authority and whether there was a "substantial basis" for her decision to issue a warrant. *Mills v. City of Barbourville*, 389 F.3d 568, 576 (6th Cir. 2004); *see United States v. Tagg*, 886 F.3d 579, 586 (6th Cir. 2018); *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013). If the judge wasn't arbitrary and had a substantial basis for her decision, we pay "great deference" to her probable-cause determination. *Mays v. City of Dayton*, 134 F.3d 809, 814 (6th

Cir. 1998) (quotation omitted); *see United States v. Christian*, 925 F.3d 305, 311–12 (6th Cir. 2019) (en banc).[7]

Moreover, we can affirm the district court's decision if probable cause supports one or more of the three charges against Chiaverini. *See Darrah v. City of Oak Park*, 255 F.3d 301, 311–12 (6th Cir. 2001); *Marcilis v. Twp. of Redford*, 693 F.3d 589, 604 (6th Cir. 2012). He brings false-arrest and malicious-prosecution claims based on an alleged unreasonable seizure. Because all of those claims arise under the Fourth Amendment, their success depends on whether probable cause supported his detention and prosecution. *Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 1515 (2021). If probable cause did exist for at least one of the charges, we can conclude that he was "no more seized when [he was] detained to await prosecution for several charges than if he were seized for just one valid charge." *Id.* For that reason, even tacked-on "meritless charges . . . [do] not change the nature of the seizure." *Id.* at 409 n.3.

So long as probable cause supports at least one charge against Chiaverini (like his receipt-of-stolen-property violation), his false-arrest and malicious-prosecution claims based on other charges (like his money-laundering charge) also fail. *Howse*, 953 F.3d at 409–10. Chiaverini's warrants involved three charges: (i) receiving stolen property, (ii) license violations under the

---

[7] Chiaverini says we can't consider the state court's issuance of a warrant and preliminary hearing. He believes that our decision in *Bradley v. Reno* precludes us from considering the court's probable-cause finding because he couldn't appeal it—given that his charges were dropped. 749 F.3d 553, 557 (6th Cir. 2014). But *Bradley* stands for a different point. That case says that we do not give those probable-cause findings formal preclusive effect under Ohio law. *Id.* at 558.

Still, a judge's decision to issue a warrant deserves "great deference." *Mays*, 134 F.3d at 814 (quotation omitted). And *Bradley* doesn't change that. 749 F.3d at 558 ("[A] state judge's finding of probable cause suggests, even if it does not prove, that the officer behaved reasonably in thinking he had probable cause."). So while a prior state court holding on probable cause is not a slam-dunk defense for a state entity, courts can still consider it. In any event, the district court didn't blindly defer to the state court decision. It also analyzed the facts on its own after considering the totality of the circumstances.

OPMDA, and (iii) money laundering. (*See* Appellee's Br. at 2–3.) Here, there was probable cause to arrest and prosecute him for both his receipt of stolen property and the licensure violation. So all of his false-arrest and malicious-prosecution claims fail.[8]

## A. Receiving Stolen Property

Ohio law makes it a crime to receive stolen property. It states, "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." Ohio Rev. Code § 2913.51(A). Applying the language of the statute, the officers had probable cause to believe that Chiaverini committed the crime. He "retain[ed] . . . property of another" knowing it to be stolen (or at a minimum having "reasonable cause to believe" that it had been stolen). *Id.*

In fact, Chiaverini heard several demands to return the property. He received the hold letter from the police telling him to return the Hills' jewelry. Several times, the Hills told Chiaverini to return their property. And the officers did the same. With that knowledge, he refused to return the items. So the police had probable cause to believe that he knowingly retained stolen property.

Chiaverini's counterarguments are not persuasive. He claims that no probable cause existed because he didn't know the jewelry was stolen when he bought it. But the statute also criminalizes *retaining* stolen property, not just buying stolen property. Ohio Rev. Code § 2913.51(A). And Chiaverini retained the stolen items after he knew they were stolen. So his argument fails.

---

[8] Chiaverini argues that Ohio's money-laundering statute required the stolen property's value to exceed $1,000. Ohio Rev. Code § 2923.31(I)(2)(c). He also claims that no evidence estimated the property's value above $1,000. But we need not decide whether the officers had probable cause for the money-laundering charge because probable cause existed for the other valid charges. *See Howse*, 953 F.3d at 408–09.

Next, Chiaverini claims that the hold letter had contradictory commands. He argues that if he released the jewelry, the State could have charged him with "conceal[ing]" or "remov[ing]" the evidence under Ohio Revised Code § 2921.12. But the letter, the Hills, and several officers on different occasions directed Chiaverini to return the stolen property. And the judge who issued the warrants admitted the letter into evidence at the preliminary hearing and found the directive to return the items unambiguous. So the letter supported probable cause rather than undercutting it. *Cf. Messerschmidt v. Millender*, 565 U.S. 535, 555 (2012) ("The fact that the officers secured these [judicial] approvals is certainly pertinent in assessing whether they could have held a reasonable belief that the warrant was supported by probable cause."); *Bradley*, 749 F.3d at 558 ("A state judge's finding of probable cause suggests, even if it does not prove, that the officer behaved reasonably in thinking he had probable cause.").

Next, Chiaverini argues that he had a possessory right over the jewelry to all but the true owner. And absent a trial on who truly owned the property, he asserts that his property interests outweighed the Hills'. He adds that his ownership interests in the property implicate procedural due process. But under Ohio common law, Burns didn't acquire good title when he stole the Hills' property. *Danopulos v. Am. Trading II, L.L.C.*, 69 N.E.3d 157, 159 (Ohio Ct. App. 2016). And "'one who purchases or acquires property from a thief,' even in good faith, doesn't have a right to the possession of the goods against 'the rightful owner.'" *Id.* (quoting *Wacksman v. Harrell*, 189 N.E.2d 146, 148 (Ohio 1963)). The police made clear that the Hills were the rightful owners.

Even more important, the OPMDA required Chiaverini to return the Hills' stolen property after the police told him to. His possessory interest doesn't negate the fact that Ohio law criminalizes retaining stolen property. *See* Ohio Rev. Code § 2913.51(A). And OPMDA allows officers to recover stolen property. *See* Ohio Rev. Code § 4728.04; *see also Liberty Coins, LLC*

10

*v. Goodman*, 880 F.3d 274, 287 (6th Cir. 2018) ("If the ring bought by the dealer indeed appears to be the stolen item, the dealer will then be required under the [O]PMDA to return it to its rightful owner, [] and law enforcement will have a lead on the thief, thereby furthering the state's interests."). So Chiaverini didn't have a right to retain the items because they belonged to the Hills and the police ordered him to return the property. And his actions gave rise to probable cause to arrest and prosecute him for the crime of receiving stolen property.

## B.     The OPMDA License Violation

In addition, the facts giving rise to Chiaverini's licensing violation support probable cause. The OPMDA "allows for the possibility of criminal penalties." *Liberty Coins, LLC*, 880 F.3d at 281–82. Ohio Revised Code § 4728.02(A) provides that, except for in some limited circumstances, "no person shall act as a precious metals dealer without first having obtained a license from the division of financial institutions in the department of commerce." And whoever violates that statute "is guilty of a misdemeanor of the first degree on a first offense[.]" Ohio Rev. Code § 4728.99.

Chiaverini alluded to Chief Weitzel that he did not have a precious-metals-dealers license. And that admission gave Weitzel probable cause to believe that Chiaverini was committing a crime. *See, e.g.*, *United States v. Harris*, 403 U.S. 573, 583 (1971) (explaining that "[a]dmissions of crime . . . carry their own indicia of credibility" and are "sufficient at least to support a finding of probable cause to search"). And Weitzel did not stop there.

He did his homework. He and other officers looked on the Ohio Department of Commerce website and saw that Chiaverini no longer had a precious-metals-dealers license. All in all, Chiaverini admitted to a crime, and the police duly investigated Chiaverini's admission. On these

facts, the judge who issued the warrant and the district court both found probable cause. And we agree.

Again, Chiaverini's arguments against probable cause are unavailing. He claims that the licensure requirements do not apply to "incidental" purchase dealers. *See* Ohio Rev. Code § 4728.11(E)(4). He next reasons that the police did not request his business records to evaluate the applicability of the exemption before the arrest. And he adds that the officers' affidavits should have included information that some stores might not need a license.

But his arguments ignore the default position under the OPMDA—that unlicensed precious-metals dealers are breaking the law. And officers need not analyze every possible defense to a crime before securing a warrant. *See Fridley v. Horrighs*, 291 F.3d 867, 874 (6th Cir. 2002) (explaining that "[w]hile officers cannot ignore exculpatory facts in reaching a probable cause determination . . . it is not the rule that they must investigate a defendant's legal defenses prior to making an arrest").

Simply put, Chiaverini's potential defenses to a crime don't affect the initial probable-cause determination. Ideally, perhaps, officers investigating allegations like these might inquire into obvious explanations or defenses that a prosecutor can consider. But nothing required the police to investigate Chiaverini's affirmative defense. *Fridley*, 291 F.3d at 873 ("[I]t is not a routine part of the prearrest investigation for police officers to inquire into affirmative defenses.") Although "innocent explanations . . . may exist," they don't "render the [] determination of probable cause invalid." *United States v. Martin*, 289 F.3d 392, 400 (6th Cir. 2002); *see United States v. Terry*, 522 F.3d 645, 648–49 (6th Cir. 2008) (explaining that probable cause "does not require 'near certainty,' only a 'fair probability'" (citation omitted)). And we have explained that "the Fourth Amendment does not require that a police officer *know* a crime has occurred at the

12

time the officer arrests or searches a suspect." *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998).

Still, Chiaverini asserts that a warrant application should include all material information so that a magistrate can properly weigh the facts. But because the officers did not know about Chiaverini's exemption status, no material omission occurred. And even if the officers had listed the exemption, a court could still find probable cause because no evidence showed that Chiaverini qualified for the exemption.[9] (*See* R. 135, Memorandum Opinion and Order, at 13 n.7.); *see also Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) ("If the affidavit contains false statements or material omissions, we set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause.")

We analyze the affidavit "on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc). Chiaverini alluded to the fact that he had committed a license violation. And an investigation confirmed it. That's why the officers and the judge had probable cause to arrest and prosecute Chiaverini for violating the OPMDA. So qualified immunity applies because the state actors did not violate the Constitution by acting on probable cause.

\* \* \* \* \*

Because probable cause existed to arrest and prosecute Chiaverini on at least one charge, his malicious-prosecution and false-arrest claims fail. *Howse*, 953 F.3d at 409–10. "We need not proceed any further than the probable cause analysis to decide [his] malicious prosecution claim." *Darrah*, 255 F.3d at 312. And the same goes for his false-arrest claims. *See Marcilis*, 693 F.3d at

---

[9] The district court noted that even after discovery below, Chiaverini *never* provided evidence that he qualified for an exemption. (R. 135, Memorandum Opinion and Order, at 13 n.7.)

604. So the valid warrants here act as a complete defense to Chiaverini's claims. *See Robertson v. Lucas*, 753 F.3d 606, 618 (6th Cir. 2014) (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)) (explaining that "[a]n arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest or false imprisonment made pursuant to § 1983").

## IV.

We affirm the district court's judgment.